## ROBERTS v. BRAFFETT.

No. 1823. Decided November 25, 1907 (92 Pac. 789).

1. VENDOR AND PURCHASER—CONTRACT—SALE DISTINGUISHED FROM OPTION. An agreement embodied in a letter, reciting that the writer will give $250 for a tract of land, $100 payable on or about a specified date, and the balance on or before another date, and offering to give notes for the price, and a reply by the owner reciting his willingness to sell on the terms proposed, and enclosing notes for the price, is an agreement on the part of the owner to sell, and is not a mere option to sell.

2. APPEAL—EVIDENCE—FINDINGS—REVIEW. Where the trial court found the facts against plaintiff, the Supreme Court on his appeal is not at liberty to consider only the testimony most favorable to him, but the findings of the court must be viewed in the light of all the evidence and the reasonable inferences warranted thereby.

3. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE. A contract for the sale of real estate entered into in March, 1902, called for performance the following October by the payment of the price and the execution of the deed. The purchaser paid a part of the price, but failed to pay the balance due in October. The vendor frequently thereafter demanded payment, and notified the purchased to pay or the contract would be rescinded. On January 2, 1905, the vendor notified the purchaser that unless the price was paid by the 15th of that month, the contract would be forfeited. At the request of the purchaser, the vendor extended the time of performanec ten days. The purchaser made no effort to pay, and in March following the vendor notified him that the contract was at an end. The purchaser was in possession, but the rental value of the premises exceeded in value his part payment and the cost of his improvements. *Held*, that the purchaser was not entitled to specific performance.

4. SAME. Where time is not of the essence of a contract of sale of real estate, and the stipulations thereof are mutual, concurrent, and dependent, and neither party has sought to perform or demanded performance, specific performance will be granted at the suit of the purchaser, unless the status of the vendor by reason of the purchaser's delay, not acquiesced in by the vendor, has been changed so that performance would be inequitable, or unless the delay was willful.

5. SAME. Where time is not of the essence of a contract of sale of real estate, the time in which the purchaser in default may have the further right to complete performance may be limited by the vendor, when not in default, by giving reasonable notice that performance must be made by a certain time.

6. SAME—TENDER OF CONVEYANCE. Where time is of the essence of a contract of sale of real estate, but neither party exercises his right to declare an end to the contract, the vendor cannot, when the stipulations of the contract are mutual, dependent, and concurrent, legally place the other party in default until he himself has tendered performance by tender of a deed, and accounting for the purchase money paid.

7. SAME. Though in ordinary cases of contract of sale of real estate a period of time is stipulated for its completion, equity treats the provision as formal rather than essential, and permits a party who has suffered the period to elapse, to perform such acts after the prescribed day, and to compel a performance by the other party notwithstanding his own delay, when not willful and intentional, and when it works no injury to the other party; yet, where time is of the essence, equity as well as law demands a substantial compliance with the contract by him who seeks the equitable relief of specific performance, and in such case performance or

offer to perform within the specified time is a condition precedent unless the other party has waived performance.

8. SAME—DISCRETION OF COURT. Application for specific performance is addressed to the sound discretion of the chancellor, and it is granted or withheld according to the circumstances of each case, when the rules of equity do not furnish any exact measure of justice between the parties.

9. APPEAL—FINDINGS OF TRIAL COURT—REVIEW. Where the determination of the chancellor on the merits of an application for specific performance is reasonably supported by the evidence and is consistent with the established principles governing the equitable remedy, it will not ordinarily be disturbed by the appellate court.

10. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE. A party seeking the remedy of specific performance, and also the party who desires to maintain an objection founded on the other's laches, must show himself ready, desirous, prompt, and eager.

11. SAME. Where the delay of over two and one-half years on the part of a purchaser to perform his contract was unexplained and unreasonable and intentional, specific performance would be denied him; it not being shown that the vendor acquiesced in the delay.

12. SAME. A purchaser in a contract of sale of real estate, who seeks specific performance thereof on the theory that the contract subsists, that he has performed and that the vendor wrongfully refuses to perform, is not entitled to the relief prayed, because of equities arising on account of his possession and improvements of the premises and partial payment of the price.

13. SAME—BURDEN OF PROOF. Where specific performance is invoked by a purchaser on equities arising from his possession and improvements of the premises, the burden is on him to show his equity and the loss that will be suffered if performance is withheld.

14. SAME. Where a purchaser is otherwise entitled to a specific performance of the contract of sale, the fact that he has gained more from the possession of the premises than he has lost by his outlays and improvements will not defeat his right to specific performance, a comparison of his outlays and benefits being made only as bearing on the loss suffered by him if specific performance is withheld, and as bearing on the vendor's duty to refund the partial payment of the price.

McCARTY, C. J., dissenting.

APPEAL from District Court, Carbon County; Ferdinand Erickson, Judge.

Action by John R. Roberts against M. P. Braffett. From a judgment for defendant, plaintiff appeals.

AFFIRMED.

*D. D. Houtz* and *J. B. Milner* for appellant.

*E. A. Wedgewood* for respondent.

STRAUP, J.

This action was brought by plaintiff for specific performance of a written contract, by the terms of which it was alleged the defendant sold to the plaintiff a ranch in Carbon county for the sum of $250. It was also alleged that the plaintiff performed all the conditions of the contract on his part to be performed, and that he tendered the agreed purchase price, but that the defendant refused to execute a deed of conveyance. It was further alleged that in pursuance of the contract, and at the time of its execution, the plaintiff entered into and ever since has remained in possession of the land, and that he made valuable improvements thereon to the extent of $400. Defendant denied the contract alleged in the complaint, and affirmatively pleaded that he had offered to sell the land to the plaintiff, but because of plaintiff's failure and refusal to make the payments in accordance with the terms of the offer the contract, upon notice, had been rescinded; that the rents and profits of the land during the plaintiff's possession exceeded the taxes, the partial payment, and the value of the improvements made by plaintiff. The court found the issues substantially as alleged in the defendant's answer, and, as conclusions of law, held the plaintiff guilty of laches and an abandonment of the contract, and denied the relief prayed for by plaintiff. On appeal, the plaintiff assails the findings and conclusions.

There is but little conflict in the evidence. Upon the material questions involved there is none. On March 19, 1902, the plaintiff wrote the defendant: "I will give you $250 for your place; pay you $100 on or about the 20th of June, 1902, and the other $150 on or about the 1st of October, 1902. I will give you my notes if you want them, with my name and Joe's on them. If you want to do this way write

by return mail and let me know, for I want to put the place in, that is, if I get it." In reply thereto the defendant two days thereafter wrote plaintiff: "I am willing to sell you the ranch at Farnum for $250—$100 to be paid on or before June 20, and $150 to be paid on or before October 1, 1902; title to pass when payments are completed, if completed on the dates mentioned; you to assume the taxes to accrue this fall, and to assume any expenses in connection with water assessments of trial of water case. Accordingly I enclose herewith two notes, one of $100 payable on or before June 20, 1902, and one for $150 payable on or before October 1, 1902. Please mail these notes to me at Scofield when executed. Under this arrangement you are to go into possession of the land at once and of course remain in possession until you should fail to make the payments according to the agreement." The notes were executed and delivered March 28, 1902, whereupon the plaintiff entered into possession of the land.

From the foregoing it is apparent that the agreement was not a mere option to purchase, but was an agreement to sell on the one part and an agreement to buy on the other. In this respect, the agreement is as alleged in the complaint—not as alleged in the answer—and the court should have so found, and as such it will be treated by us. On June 7, 1902, the plaintiff paid the $100 note. He failed to pay the $150 note at its maturity, October 1, 1902. Thereafter the defendant made oral demands for payment, and especially in the year 1903 when he told the plaintiff that he would have to "fix it up" or the defendant would rescind the contract. Each time the plaintiff promised to pay at some stated time, but failed to do so. On July 6, 1903, the defendant wrote plaintiff: "Your note at this time amounts to $175. I wish you would drop me a line and inform me as to whether you desire to pay the note and secure the deed, or in case you don't say anything are you aware of the fact that the payments so far made are forfeited? Will be glad to dispose of this matter without further delay, and wish you would write me at once." Plaintiff admitted receiving this

letter, but paid no attention to it—made no effort to pay the
note—and in no manner concerned himself about it.    There-
after the defendant at divers times again verbally requested
payment of the note, but the plaintiff disregarded the re-
quests, except merely promising to pay at some future time.
After payment had thus been delayed by plaintiff, wholly
through his own neglect and not because of anything said or
done or omitted by the defendant, for over two years, the
defendant, on January 2, 1905, again wrote plaintiff: "There
is due as a balance upon the ranch at Farnum the sum of
$225.    Please take notice that unless this money is in my
hands by January 15th on said last mentioned date I will
declare a forfeiture and rescission of the sale agreement with
you, and will dispose of the property to another party who is
desirous of purchasing the same.    I have been desirous of
affording you every reasonable opportunity to avoid a loss
in connection with this agreement, but cannot permit the
matter to stand any longer, as I am in need of the money."
To this letter the plaintiff replied on the 4th of January that
he was hard up for money, that he had not sold anything from
the ranch, that it was time for the defendant to have his
money, that he (plaintiff) wanted to borrow some money on
a mortgage, and asked whether the defendant could refer him
to a money lender, that he wanted as much money as he
could get to buy cattle with, and further stated: "If you
cannot do anything for me let know by return mail, so I
will know what to do so I can get you the money.    I may
want ten days longer than you gave me, but if you can do any-
thing for me sooner, do so.    Let me know as soon as you
can."    On the 8th day of January the defendant replied
that he could not help plaintiff on the mortgage suggestion,
and stated: "I can extend the forfeiture period until Jan-
uary 25, 1905, but no longer, as will need to make a turn be-
fore February 1st."

The evidence is somewhat conflicting as to whether the
plaintiff received this letter, but the court was amply justified
from the evidence in finding that he did.    But the plaintiff
himself admitted that notwithstanding the letter of January

2d, and his reply thereto on the 4th, he made no effort to pay the note, and gave the matter no concern whatever, but wholly failed and neglected to pay, as he had done theretofore. The note still remaining unpaid, no effort to pay having been made, and no willingness or desire expressed to pay it, the defendant, on March 18, 1905, wrote plaintiff: "I regret to be compelled to notify you that in pursuance of previous notices requiring in the alternative the payment of the money at certain definite dates now long past or the rescission of the sale agreement between us, and I have sold the Farnum property to Mr. W. D. Stephens." The plaintiff admits receiving this letter and making no reply thereto, and that he made no request for any further extension of time. He remained silent in the matter until the 25th day of April, 1905, when he deposited the sum of $242.25 with the county clerk of Carbon county, who, on the same day, at plaintiff's request, wrote the defendant that said sum had been deposited which was to be paid to him upon the execution of a deed of conveyance. The defendant made no reply to this letter, but, on May 1st, wrote plaintiff: "Pursuant to my notices given to you some time ago rescinding negotiations looking to the purchase by you of the Farnum ranch, I beg to return herewith your note of $150, no part of which has been paid, and the payment of which was, by my notice of rescission of said contract, waived." The note was inclosed and then returned to plaintiff. To this letter also the plaintiff made no reply. The note was received by him and not returned. On May 17th following, the plaintiff began this suit by the filing of a complaint and the service of a summons. During all this time the plaintiff remained in possession of the land.

The ranch consisted of about forty-five acres through which coursed a steam of water. Most of the land was wild and unbroken. Some of it had been cultivated before plaintiff's possession. Along the river bottom were cottonwood trees, stumps, and willows. The evidence on behalf of plaintiff shows that he broke, cultivated, and seeded only about thirteen or fourteen acres of the land, of which there were about

five acres of bottom lands from which he removed about one hundred trees and stumps with which he did some riprapping along the stream, all at an expense and to the value, as alleged in his complaint and as testified to by plaintiff himself, of $400. The plaintiff made no other improvements on the land, except the building of a boundary line fence at an expense of $35. Plaintiff also testified that he paid out about $20 court costs in litigation of certain water rights; that he paid the taxes during the time of his possession; and that the riprapping done by him amounted to only $25.

On behalf of the defendant there was evidence which tended to show that the plaintiff dug and removed from the land only about ten trees and ten stumps. While plaintiff testified that all he did on the land in the way of breaking, cultivating, and clearing it, and doing the riprapping improved the land to the extent of $400, yet the details of the work and the time employed, as testified to by him, were somewhat indefinite and uncertain, for he several times testified that he had no definite or independent recollection of the time employed or the work done, but that such matters were only estimated by him. Much of the evidence relating thereto is of such a character as to warrant the trial court in finding that the plaintiff exaggerated the value. Let that be as it may, those were matters more properly for the trial court. It having found the facts against the plaintiff, we are not, on review, at liberty to consider only the testimony most favorable for the plaintiff, but the findings of the court must be viewed in light of all the evidence, and of all the reasonable deductions and inferences which the trial court was warranted in drawing therefrom. Upon the land so improved, according to his own testimony, the plaintiff raised grain to the value of $115 in 1902; in 1903 to the value of about $155; in 1904, grain and potatoes to the value of about $590; and in 1905, hay and potatoes to the value of about $225. The costs and expenses of raising these crops and the amount of taxes paid by the plaintiff are not shown. From all the evidence we think the court was justified in finding that the rental value of the premises during the time occupied by

plaintiff exceeded in value the $100 partial payment and the costs of improvements made by him. The evidence further shows that until the plaintiff deposited the money with the clerk no demand or request had been made by him for a deed; neither did the defendant make an actual tender of a deed, nor did the plaintiff indicate any willingness or ability to pay. On the other hand, the defendant expressed a desire and willingness to convey, and although he did not make an actual tender of a deed, the fact that he was able, ready, and willing to convey prior and up to January 25, 1905, upon plaintiff's payment, is not disputed. No claim whatever is made by plaintiff that the defendant was not at all times prior to January 25, 1905, able, ready, and willing to perform his part of the contract upon plaintiff's payment of the money. Nor does the plaintiff in any particular claim that his delay in making payment was due to defendant's failure to tender a deed, or that it was in any manner caused or induced thereby. The claim made by him is that, because the defendant did not make an actual tender of a deed, the defendant was not in a position to declare the contract ended, and thus to terminate plaintiff's right to a specific performance of the contract at any time within the period of the statute of limitations, on plaintiff's tender of the money.

It is said that the plaintiff testified that if the defendant had tendered a deed, he would have paid the money. That came about in this way: When plaintiff was testifying, he was asked by his counsel whether he would have paid the money had the deed been tendered. This was objected to as incompetent, irrelevant, and self-serving. The court stated that if the case were before a jury he would sustain the objection, but as it was only before the court he would overrule the objection *pro forma,* and consider the admissibility of the evidence later. Thereupon the plaintiff answered in the affirmative. But, on being further examined on the question, he stated that his failure to pay the money was not because a deed had not been tendered, and that, until he had deposited the money with the county clerk, he had

made no request for a deed. When asked why he had not paid the money, he said that he did not know that the defendant wanted it; and when shown the letter of July 6, 1903, which plaintiff admitted was received by him, and asked if by its language he did not understand that the defendant was • urging and demanding payment, and that the deed was ready for him upon payment being made, he said he did not so understand it. But with the correspondence of the parties subsequent to the maturity of the note before us, and with plaintiff's admission that the defendant had also orally demanded payment of the note, it is most difficult to conceive of plaintiff's not knowing that the defendant wanted his money and was urging that it be paid. That the plaintiff delayed payment for an unreasonable time, due solely to his own default and neglect, and wholly uninfluenced by anything said or done or omitted by the defendant, cannot well be gainsaid. This, is, therefore, not a case of mere delay in making payment by a vendee where the vendor remained silent and inactive or otherwise acquiesced in the vendee's delay or failure to pay. The evidence most conclusively shows the contrary.

This brings us to a consideration of the principal claim made by the plaintiff that, notwithstanding his delay and neglect, he is entitled to have the contract specifically enforced, because the defendant made no tender of a deed, and therefore did not put the plaintiff in legal default. It is urged by plaintiff: That time was not of the essence of the contract; that the stipulations of the contract were mutual, concurrent, and dependent; that in such case, where the deed is to be delivered upon the payment of the price, either on a day named or without any day having been specified, an actual tender and demand by one party is absolutely necessary to put the other in default, and to cut off his right to treat the agreement as still subsisting; that so long as neither party makes such tender—of the deed by the vendor and of the price by the vendee—neither party is in default; that the defendant could not treat the agreement as rescinded until he had made a tender of the deed, and returned the part of the purchase

price paid and surrendered the note held by him; that until he had done so the plaintiff could not legally be in default, but was entitled to have the contract regarded as still subsisting, and to have it specifically enforced at any time within the period of the statute of limitations—if prior to the suit he had made a tender of the full purchase price; and that he was especially entitled to such relief because of his possession of the premises and of the improvements made by him. In cases involving the foregoing propositions, the principles of law invoked by plaintiff have application, and a specific performance of the contract should be granted unless the status of the defendant by reason of the delay not acquiesced in by him has been changed so that performance would be inequitable, or the delay was willful. The defendant has not pleaded that his status has been changed, nor has he offered any evidence showing such fact. True, he offered to show that he had sold the premises to another, but, upon objection made to such offer, he voluntarily withdrew it. But the case assumed by plaintiff, in his contention, is very unlike the case presented by the record, in two very important particulars. One is that though time was not originally of the essence of the contract it was afterwards made so by the parties; the other is the unexplained and intentional delay of plaintiff.

It may be conceded that the stipulations and provisions contained in the contract were mutual, concurrent, and dependent, as is contended by appellant. It may also be conceded that time was not of the essence of the contract as originally made. But, as Mr. Pomeroy says in his work on Specific Performance of Contracts, at section 395 (2d Ed.):

"As the doctrine that time is not essential in the performance of the contract may sometimes work injustice, and be used as the excuse for unwarrantable laches, the following rule was introduced at a comparatively late period, and is now firmly settled, which prevents the doctrine from being abused by the neglect or willfulness of either party. If either the vendor or the vendee has improperly and unreasonably delayed in complying with the terms of the agreement on his side, the other party may, by notice, fix upon and assign a reasonable time for completing the contract, and may call upon the defaulting

party to do the acts to be done by him, or any particular act within this period. The time thus allotted then becomes essential, and if the party in default fails to perform before it has elapsed, the court will not aid him in enforcing the contract, but will leave him to his legal remedy."

At section 396 he says that the notice cannot be an arbitrary and a sudden termination of the contract; it must allow a reasonable length of time for the other party to perform, and if it fails in any of these respects it may be disregarded and will produce no effect upon the equitable remedial rights of the party to whom it is given; and that to be effectual in making the time allotted an essential element of the performance the notice must be express, clear, distinct, and unequivocal. The rule is also well stated in Pomeroy's Equity Jurisprudence, vol. 6, sec. 815, where it is said.

"Where time is not of the essence, the time in which the party in default may have a further right to receive performance may be limited by the party not in default giving reasonable notice that performance must be made by a certain day. If a reasonable time after receipt of the notice is thus given the party in default, equity will not enforce specific performance in his behalf after the day named."

This principle of law has become so well settled that it is unnecessary to multiply cases on it. We think such a notice was given by the defendant in his letter of January 2, 1905, wherein he stated the amount due, and wherein the plaintiff was notified that "unless this money is in my hands by January 15th, on the said last-named date I will declare a forfeiture and rescission of the sale agreement with you, and will dispose of the property to another party who is desirous of purchasing the same." No claim is made that the time fixed in this notice was, under the circumstances, unreasonable, or that it took the plaintiff by surprise. The only claim made by the plaintiff in his reply to this notice was that he was hard up for money, and that he might want 10 days longer than the defendant gave him. The defendant thereupon wrote him that he would extend the time until January 25th, but no longer. We here then have time made of the essence, which was expressly and unequivocally fixed on the 25th day of January, 1905, by the mutual agreement

of the parties.   The performance of the contract within such time was not waived by the defendant, nor was there anything done by him which could be construed as a waiver. It is not claimed that the plaintiff failed to perform within such time in consequence of anything said or done by the defendant, nor that the defendant after the time had elapsed remained silent or inactive, or in any manner treated the contract as still subsisting.

Notwithstanding the subsequent agreement between the parties fixing the time of payment definitely on the 25th day of January, the plaintiff, according to his own testimony paid no attention to the time so fixed, and made no effort to pay the money within such time.   He remained silent and inactive during all the months of January, February, March, and up to April 25th, when he deposited the money with the county clerk.   This was not done until he had received the defendant's letter of March 19th notifying him of the sale of the land to Stephens.   No attempt was even made to explain the delay, nor was there any excuse offered to account for the failure of performance within the time fixed. Nor is it made to appear that the plaintiff regarded the contract as still subsisting except as may be inferred from his continued possession of the premises.   When, however, time is made of the essence, the question of reasonable delay or laches is ordinarily not involved, for, as is said,

"If time is of the essence, no question of delay or laches, using these words with regard to their true meaning, can properly arise. If time is essential, the stipulation of the contract must be exactly complied with; not the delay, but the failure to perform at the exact day, cuts off the right of the defaulting party." (Pomeroy on Spec. Perf. section 399.)

At sections 361 and 362, the author above quoted well points out the distinction between granting specific performance of contracts when time is, and when not, made essential.   He says:

"Where the stipulations are mutual and dependent—that is, where the deed is to be delivered upon the payment of the price, either on a day named or without any day being specified, an actual tender and

demand by one party is absolutely necessary to put the other in default and to cut off his right to treat the agreement as still subsisting. So long as neither party makes such tender—of the deed by the vendor and of the price or securities by the vendee—neither party is in default; the contract remains in force, and either party may make a proper tender or offer and sue, until barred by the statute of limitations. This rule, however, does not apply to those contracts in which the time of performance has been made essential, and the agreement itself is to be regarded as void or rescinded if the vendee fails to make his payment on the stipulated days. In all those contracts where the time of payment by the vendee is essential and not simply material, and a *fortiori* in those where, if the vendee's payments are not made upon the exact day named, the vendor may treat the agreement as at an end, the vendee must make an actual tender of the price and a demand of the deed at the specified time, as a condition precedent to his maintaining his suit. The same is true of the vendor when the time of his conveyance is made essential. This rule is involved in the very notion of time being of the essence of the contract."

When, therefore, the stipulations of the contract are mutual, concurrent, and dependent, and time is only material but not essential, so long as both parties have taken no steps to assert their respective rights or demands for a completion, and so long as the vendor has made no tender or offer of deed or demand on the vendee, and the vendee has made no tender of the price or demand on the vendor, the contract continues to subsist until barred by limitation. So, too, when time is of the essence, yet if neither party has exercised his right to declare an end to the contract, or where the one party has remained silent and inactive, or has otherwise done something amounting to a waiver, or has treated the contract as still subsisting, he cannot, when the stipulations of the contract are mutual, dependent, and concurrent, legally place the other party in default until he himself has tendered performance or offered to perform. In such cases, in order that he may terminate the contract, the vendor must tender or offer of a deed, and account for the purchase money paid. Appellant has cited a large number of authorities where the principles of law invoked by him were applied, but they are not applicable here. In ordinary cases of contract, equity does not regard time as of the essence of the contract. Although in ordi-

nary cases of contract for the sale of land a certain period of time is stipulated for its completion, or for the execution of its terms, still equity treats the provision as formal rather than essential, and permits a party who has suffered the period to elapse to perform such acts after the prescribed date, and to compel a performance by the other party, notwithstanding his own delay, when not willful and intentional, and when it works no harm to the other party. But, as is said in Pomeroy's Equity Jurisprudence, vol. 4, sec. 1408:

"Time may be essential. It is so whenever the intention of the parties is clear that the performance of its terms shall be accomplished exactly at the stipulated day. The intention must then govern. A delay cannot be excused. A performance at the time is essential; any default will defeat the right to a specific performance."

In support of this the author cites numerous cases from many different states. See, also, vol. 6, sec. 1811, of the same work, and cases there cited.

Where, therefore, time is of the essence, equity, as well as law, demands a substantial complaince with terms of the contract by him who seeks the equitable relief of specific performance or a rescission of the contract. In such case performance, or offer to perform, within the specified time, is a condition precedent to his maintaining a suit, unless, of course, the other party, through silence or otherwise, has waived performance within such time or thereafter has otherwise treated the contract as subsisting. With this condition the evidence shows most conclusively the plaintiff has not complied. The contract, when declared on by him, was at an end. In addition to the authorities already cited, the following cases fully support our conclusion. *Fuller v. Hovey,* 2 Allen (Mass.) 324, 79 Am. Dec. 782; *Chabot v. Winter Park Co.,* 34 Fla. 258, 15 South. 756, 43 Am. St. Rep. 192; Fry, Specific Performance, p. 419; *Austin v. Wacks,* 30 Minn. 335, 15 N. W. 411; 2 Warvelle on Vendors (2d Ed.), secs. 476, 747, 756; *Johnson v. Evans,* 8 Gill (Md.) 155, 50 Am. Dec. 678; *Kirby v. Harrison,* 2 Ohio St. 326, 59 Am. Dec. 680; *Upton v. Maurice* (Tex.

33 Utah—5

Civ. App.), 34 S. W. 642. Though time were not here to be regarded as essential, still, to what extent was plaintiff's right to specific performance affected by his laches and his supposed equities? It is a familiar and general doctrine, recognized by all the authorities, that the application for specific performance is addressed to the sound discretion of the chancellor, guided and governed by the general principles of equity; that it is not granted as a matter of right in either party, but it is granted or withheld according to the circumstances of each case, when the rules or principles of equity will not furnish any exact measure of justice between the parties; that the party seeking the relief must show that he has performed, or was eager, prompt, and ready to perform, the contract on his part, and has not been guilty of laches or unnecessary delay, or that such delay is excused or has been acquiesced in by the other party; and that much must be left to the judgment and sound discretion of the judge who hears the case. And where his determination of the merits of the application is reasonably supported by the evidence and is consistent with the established principles which govern the equitable remedy, it will not ordinarily be disturbed by the appellate court. And, as is stated in Pomeroy's Equity Jurisprudence, vol. 4, sec. 1408.

"Although time is not ordinarily essential, yet it is, as a general rule, material. In order that a default may not defeat a party's remedy, the delay which occasioned it must be explained and accounted for. The doctrine is fundamental that a party seeking the remedy of specific performance, and also the party who desires to maintain an objection founded upon the other's laches, must show himself to have been 'ready, desirous, prompt, and eager.'"

From this record the conviction is forced that plaintiff fell short of showing himself "ready, prompt, and eager." That his delay of over two and one-half years, wholly unexplained and unexcused, was, under all the facts of the case, unreasonable and intentional, cannot well be disputed. It is not claimed nor could the claim be successfully made, that the defendant acquiesced in the delay, for he at all times demanded his money and insisted that it be paid. Appellant

also insists that he was entitled to specific performance because of equities claimed to have arisen on account of his possession and improvement and of his partial payment of purchase price. Under what circumstances specific performance will be granted because of possession and improvements made when permanent and beneficial to the freehold, and whether the character of plaintiff's improvements are such as are regarded permanent and beneficial within the meaning of the rule, need not be considered by us. Plaintiff's action was not grounded on such theory. It was based on an alleged subsisting written contract for the sale of realty, and was founded on the theory that the plaintiff had fully performed on his part, but that the defendant wrongfully and in violation of the contract refused to perform on his part. But what equities has plaintiff shown in this regard? The record shows that the $150 note was surrendered to him before the commencement of the action. The defendant in his answer alleged that the plaintiff had the use and benefit of the land for three years, and that the rental value thereof exceeded the taxes and partial payment of purchase price, and offered, if it were determined that any balance should be due plaintiff by reason of the premises, to pay the same. The court found, and we think there is evidence to justify the finding, that the rental value of the land exceeded the partial payment and the value of the improvements made by plaintiff. And, as shown by plaintiff's own testimony, the value of his improvements, including the fence, and the part payment made, and court costs expended by him amounted to $555; and the value of the grain and products raised by him on the land was $1,085. This of course was not net profits. Where, however, specific performance is invoked on equities arising from possession and improvements, the burden is on plaintiff to show his equity and the loss that will be suffered by him if specific performance is withheld. While there are authorities which hold that a vendee under some circumstances cannot have a specific performance of the agreement because of his possession and improvements made by him when he has gained more by the

possession and use of the land than he has lost by giving up
the improvements, or when he has been compensated for
his outlays in making the improvements, yet we do not wish
to be understood that specific performance is here denied on
such ground. That is to say, were the plaintiff otherwise
entitled to a specific performance of the contract declared on,
the fact that he has gained more from the possession than
he has lost by his outlays and improvements would not de-
feat his right to a specific performance. A comparison of his
outlays and benefits is made only as bearing on the loss
suffered by him if a specific performance is withheld, and
as bearing on the vendor's duty to refund the $100 paid on
purchase price.

On a consideration of the whole case we think the evid-
ence required a judgment for the defendant. The judg-
ment of the lower court is therefore affirmed, with costs.


FRICK, J. (concurring).

While concurring in all that is said by my Brother Straup
why a specific performance cannot be decreed in this case,
I nevertheless, in view of what is insisted upon by the
Chief Justice in his dissenting opinion, desire to add a
brief statement of the reasons upon which I base my concur-
rence.

The real and underlying principles that control this case,
and upon which Mr. Justice Straup bases his conclusions,
are not always present in cases of specific performance, and
sometimes when present are obscured by the decisions, and at
other times, as seems to have been done by the Chief Jus-
tice, are entirely overlooked. The facts upon which these
principles arise are established beyond peradventure in this
case. The controlling facts are these: After the plaintiff
had been in default of payment for about 2½ years, and both
parties had continued during all that time to treat the or-
iginal contract as in force, the defendant wrote a letter to the
plaintiff, wherein the defendant stated that the amount due
on the original contract had to be paid at a date named, and
if not then paid the defendant would terminate the contract,

or rescind it, as he termed it. In this letter the time and conditions at and upon which the defendant would terminate the contract were specially stated. The plaintiff replied to this statement by asking ten days' more time than given by the defendant in which to make the payment. These ten days were granted by the defendant. Here we thus have a mutual agreement fixing a definite time at which payment must be made, and, if not made, that the contract should terminate. If what is contained in these letters did not amount to an agreement to terminate the contract, then the letters are meaningless. Under the authorities cited by Mr. Justice Straup, the defendant clearly had the right to fix a specific date at which the payment must be made, and that thereafter it could not be made as a matter of strict legal right. All this the defendant could legally have done without the consent of the plaintiff, and if the time and conditions imposed were specific and reasonable, and the plaintiff then failed to comply therewith, the defendant could have treated the contract as abandoned by the plaintiff. All this is clearly stated in the authorities cited by Mr. Justice Straup. In this case however, the plaintiff agreed to the terms and conditions and accepted them, as he legally could do. We therefore are not dealing with a case as assumed by the Chief Justice where one party only seeks to rescind a contract, but we have a case where the circumstances show a termination or rescission of an existing contract by mutual consent. After the time had elapsed in which plaintiff was required to pay and at which he had agreed to pay, the contract was terminated in accordance with the terms agreed to by the parties, and the defendant could not thereafter sue upon it, nor could the plaintiff ask to have it enforced as a matter of legal right. Both parties were relieved from its terms and obligations. The contract was dead and could be revived only by mutual consent. This was the condition when the plaintiff deposited the money with the clerk of the court, which was done three months after the date fixed at which the contract was to terminate, and these conditions existed when the plaintiff brought this action for specific per-

formance. When these facts were made to appear to the court at the trial it at once became apparent that specific performance could not be granted of that which had ceased to exist, namely, a binding contract. But the plaintiff, notwithstanding this anomalous condition demanded specific performance, and now insists that it was error not to grant it. Upon what does this demand rest?

It is sought to be based upon the doctrine that one party alone may not rescind a contract, and that where conditions are concurrent, interdependent, and mutual, neither party may place the other in default without his tendering performance of the things by him to be performed. What possible relevancy has this doctrine to the undisputed facts in this case? There was no one-sided rescission of the contract in this case, but it was abandoned by the acts of both parties. The case as it stands is rather one where a mutually rescinded and abandoned contract is sought to be revived by one of the parties without the consent of the other, and the court is asked to grant this upon the equities that arose out of and cluster around the abandoned contract. It is but an attempt to enforce a dead contract through live equities. We may disguise the real condition by argument or statement, but we cannot conceal the ever-present fact that courts can neither make nor revive contracts without the consent of the parties. The mere fact that equities exist between the parties does not alter this universally accepted truth. To argue that the defendant could not alone abrogate the contract, and absolve himself from its obligations by his own acts without first tendering performance, is but an effort to bring this case within the principles applicable to another state of facts. It amounts in its last analysis to an effort to decree specific performance upon the ground that to do so cannot injure the defendant, and gives to the plaintiff only that which, according to the popular idea of equity, he ought to have. In a case like the one at bar the inherent equities between the parties have not the slightest effect upon the question of specific performance. These are matters that may and must be adjusted otherwise than by granting specific performance. It is not of the

slightest consequence that they may be better adjusted by granting specific· performance than by not doing so. It is quite sufficient in answer to all this that there is no contract, and hence the performance of one cannot be decreed. There is nothing on which the power to grant specific performance can rest, and therefore it must be denied. If the terms imposed by the defendant requiring payment at a specific time were harsh, oppressive, or unconscionable, the plaintiff, although he had agreed thereto, could have set forth the facts and have asked to be relieved therefrom. He did not do this. Indeed, from the facts it is apparent that nothing of that kind existed. He therefore based his right· squarely upon a contract which, by his own consent, had been abandoned, and no court has the power to reinstate him in rights he voluntarily surrendered and abandoned. Much, no doubt, can be said concerning the inherent equities of this case when considered from a moral point of view. Good reasons may be advanced why plaintiff should be given the land in question on payment of the purchase price. Were I to follow my own inclinations I should unhesitatingly pronounce judgment to that effect. Where, however, the well-established principles of law and rules of equity require a different judgment, it is my duty as a member of this court to follow them. These principles are so well defined in the opinion of Mr. Justice Straup, and the reasons there given are so cogent and clear, that I have no alternative but to abide by them although poetic justice may not be reached in a particular case.

McCARTY, C. J. (dissenting).

I am unable to concur with my brethren in the foregoing ·opinion.

The record in this case shows that when the appellant went into possession of the land in question it was, with the exception of about $2\frac{1}{2}$ acres, in a wild state and in an untillable condition. No· part of the premises was enclosed by fence, and stock roamed over the land at will. The market value of the entire tract did not exceed $250, the price which appellant agreed to pay for it. Immediately after Mr. Roberts, the appellant, went into possession of the premises he began clearing off the trees, stumps, willows, and brush which abounded

on the land. The evidence, without conflict, shows that during the first year, with three teams and the assistance of two hired men, he devoted twenty-four days to clearing the land. A team of six horses was required to remove some of the trees from their bed in the soil after said trees had been uprooted by digging and excavating around them. The timber thus removed was taken to the river, which runs through the premises, and there made into a riprap to prevent the river from cutting into the land and washing away the soil. The labor thus performed the first year, the evidence shows, amounted in value to $288. The second year Roberts did $141 worth of labor, clearing and leveling the land; and the third year about $12, making a total of $441 in labor put upon this land, which, the record shows, was absolutely necessary to put it in a condition for farming and agricultural purposes. Besides the expenditure made in getting the land in proper condition for farming, Roberts paid out $20 for grass seed, and seeded thirteen acres of the land to grass, which required about two weeks' work. He also built fencing on the premises at a cost of $35. It will thus be seen that Roberts, during the first three years he was in possession of the premises, expended in money and labor about $500 in improving them. The two notes executed by Roberts for the purchase price of the land (one for $100 payable on or before January 20, 1902, and one for $150 payable on or before October, 1902), omitting the amounts and dates of payment, were in the following form: "Farnum, Carbon County, Utah, March 28, 1902. On or before the ——— day of ———, 1902, for value received, I promise to pay to Mark P. Braffett, or order, the sum of ———:——— dollars, negotiable and payable at Scofield, Carbon county, Utah, without defalcation or discount, with interest at the rate of one per cent per month from date until paid, and I agree that in case this note is not paid when due, and suit is brought for the collection hereof, to pay a reasonable attorney fee. (Signed) John R. Roberts." Roberts paid the first note ($100) a few days after it became due. He also, in pursuance of the terms of his contract to purchase, paid the taxes each year, and $25 in

litigating a water right connected with the land. Some six months after the note representing the last installment of the purchase price became due Braffett wrote to Roberts from Salt Lake City in part as follows: "I wish you would drop me a line and inform me as to whether you desire to pay the note and secure the deed." On January 2, 1905, about eighteen months after the first letter was written, Braffett again wrote to Roberts demanding his money, with notice that unless it was paid by January 15th he would "declare a forfeiture and recission of the whole matter." On January 4th Roberts wrote to Braffett asking for ten days' additional time, which was granted. In the course of the letter he says: "I am hard up for money now. I have not sold any yet from my ranch, but it is time for you to have your money. Can you help me out? I want to mortgage our place. There are 240 acres that we have deeds for. I want as much money as we can get on it. If you will look that matter up for me I will pay you for your trouble, or refer me to a money loaner if you can."

On April 25, 1905, Roberts deposited with the clerk of Carbon county, Utah, $242.25 for Braffett, final payment of the purchase price with interest thereon. On the same date the clerk wrote to Braffett as follows: "Price, Utah, April 25, 1905. M. P. Braffett, Esq. Salt Lake City. Dear Sir— John R. Roberts has deposited with me the sum of $242.25 to be paid to you when you execute a proper deed to some land that you sold about three years ago. Yours truly, D. W. Holdaway." On May 1, 1905, Braffett wrote to Roberts the following letter, and returned to him the unpaid note: "Salt Lake City, Utah, May 1, 1905. J. R. Roberts, Esq. Wellington, Utah. Dear Sir—Pursuant to my notice given to you some time ago rescinding negotiations looking to the purchase by you of the Farnum ranch, I beg to return herewith your note for $150.00, dated March 28, 1902, due October 1st of the same year, no part of which has been paid, and payment of which was by my notice of rescission of said contract waived. M. P. Braffett." On May 17, 1905. Roberts began this action in the district court of Carbon county,

Utah, asking for specific performance of the contract. The $242.25 theretofore delivered to the clerk was left upon deposit with said officer, subject to Braffet's order upon the execution by him of a deed to the land in question.

These being the circumstances and conditions, I am decidedly of the opinion that the district court erred in finding the issues in favor of Braffett. Under the contract the rights and obligations of the parties were mutual, concurrent, and dependent. As stated by counsel for appellant in their brief, "the right to the money was conditioned upon the delivery of the deed and the right to the deed was conditioned upon the payment of the money. . . . Neither party could put the other in default without first tendering performance." In order for Braffett to put Roberts in default, it was incumbent upon him to tender a deed and demand payment of the unpaid purchase price. This he did not do. Therefore I fail to understand upon what theory it can be successfully maintained that Roberts alone was in default.

Assuming, for the purposes of this case, that the correspondence carried on between these parties after the last installment of the purchase price fell due made time of the essence of the contract, it did not change the nature of their obligations under the contract. These still remained mutual, concurrent, and dependent, and, under the terms of the contract, were to be performed at Scofield, Carbon county. While it is true that Roberts failed to make final payment on the date agreed upon (January 25, 1905), it is equally true that Braffett was not ready with a deed at the time and place specified in the contract to carry out his part of the agreement. Braffett could not, without first tendering a deed, compel Roberts to make final payment, and thereby force him to commence suit for specific performance or else wait until it suited Braffett's convenience to cancel the note and deliver a deed to the land. To further illustrate the contention that Braffett was not in a position to rescind the contract and declare a forfeiture of all rights that Roberts had acquired thereunder, let us suppose that when the time arrived for the payment of the money on the one hand and

the delivery of the deed on the other ·(October 1, 1902), Roberts, without tendering payment, and—paraphrasing the demand made by Braffett, which demand, it is claimed, made time of the essence of the contract and put Roberts in default —had said: "I wish you would drop me a line and inform me as to whether you desire to deliver a deed, return my note and receive. final payment on the land." And again: "Please take notice that unless this deed is in my hands on October 12th, I will declare a rescission of the whole agreement," etc., and Braffett had failed to forward a deed and return to Roberts the unpaid note as requested—could it be successfully urged that Braffett would thereby have put himself in default? Certainly not. Neither did Roberts put himself in default by failing to comply with Braffet's demand to pay the balance due on the land, especially in view of the fact that Braffett himself was in default. Nowhere in the record does the evidence disclose that Braffett had a deed made out and ready for delivery to Roberts at Scofield or elsewhere on payment by Roberts of the balance due on the land. True, Braffett made repeated demands for his money, but these, under the circumstances, cannot be construed as offers on his part to perform. Warvelle, in his work on Vendors, section 816 (2d Ed.) says:

"But it would seem, even where time is made of the essence of the contract, that if all the payments are due, and the vendor has failed to exercise his right to declare a forfeiture for default in making payments, he must first offer to perform before declaring same. The silence or inaction of the vendor must be regarded as a waiver of his rights, and the payment of the purchase money and tender of conveyance would become concurrent acts, and a deed should be executed and tendered to the vendee together with a demand for payment."

In 6 Pom. Equity Juris. (Section 809, Equi. Rem. Vol. 2) the rule is tersely, and, as I think, correctly stated as follows:

"Where the stipulations are mutual and dependent—that is, where the deed is to be delivered upon payment of the price—an actual tender and demand by one party is necessary to put the other in default, and to cut off his right to treat the contract as still subsisting."

Therefore it matters not how we may view the equities of the case, it was still incumbent upon Braffett, before he could rescind and terminate the contract, to first tender a deed and demand payment. At no time did Roberts, either by word or act, signify that he had any intention whatever of abandoning the contract, but, on the contrary, in answer to the demands made upon him for payment he invariably expressed an intention of paying for the land and securing a deed. Therefor Braffett was not excused from tendering a deed on the theory, or, rather, assumption, that, under the circumstances, a tender would have been a vain and useless act.

While it is apparent from the record that Roberts' failure to make final payment at the time stipulated in the contract was not due to any refusal or failure on the part of Braffett to tender a deed, yet neither the trial court nor this court is warranted in holding, under the facts as developed at the trial, that if a deed had been tendered by Braffett, Roberts would not have taken it up, and paid the balance of the purchase price. On this point Roberts testified: "I would have paid the money if Braffett had offered me the deed." At the time this testimony was offered objections were made to it, and the trial court expressed some doubts as to its admissibility. Reference is made to this fact in the prevailing opinion, and attention is also invited to certain statements made by Roberts on cross-examination as being inconsistent with this testimony. This apparent inconsistency, if it can be called such, I think is largely due to the fact that some of the questions asked Roberts on cross-examination respecting the letters he had received from Braffett were so framed as to convey the idea that these letters not only contained demands for payment, but amounted to a tender of performance on the part of Braffett, and that he (Roberts) alone was in default. That is, counsel, in asking the questions, assumed the existence of a state of facts entirely different in some respects—vital in character—from that established by the proof. To illustrate this, the following is quoted from the record: "Q. Now, if you were ready to give Mark Braffett the money that was due, when he wrote to you on July 6th,

1903, that he wanted that money, you could have your deed, why didn't you give it to him? A. Why, if I had understood that letter that way, I would mighty quick have rustled the money. Q. That is your answer, that you didn't understand this letter? . . . A. I didn't understand how this letter reads in law." The letter referred to speaks for itself, and is as follows: "Your note at this time amounts to $175. I wish you would drop me a line and inform me as to whether you desire to pay the note and receive the deed, or in case you don't say anything, are you aware of the fact that the payments so far made are forfeited? Will be glad to dispose of this matter without further delay, and wish you would write me at once." Whatever may be said of this letter as a demand for payment, it is in no sense a tender of performance on the part of Braffett. Now Braffett is a licensed attorney at this court and in the active practice of his profession, and is presumed to know something about the legal effect of writings of this character. To hold that he intended the letter as a tender of performance on his part would be to cast reflection on his learning and ability as a lawyer.

Roberts, in reply to certain questions asked him on cross-examination respecting the construction he placed on Braffett's letter and why he had not paid Braffett the money, asked counsel conducting the examination the very pertinent question: "But where was the deed to come from?" This same question might well be asked at this time, for this court is not authorized in holding that Braffett would have carried out the contract on his part if Roberts had sent him the money. The facts do not warrant a finding of this character. As to whether Braffett would have delivered a deed had Roberts paid him the money is a matter of speculation and conjecture. One thing is evident, however. When the money was finally tendered to Braffett, and, as I contend, during the life of the contract, he refused to accept it and to deliver a deed. It is no answer to say that Roberts did not defer making final payment because of Braffett's default and failure to tender performance, but that his failure

to pay at the time agreed upon (January 25, 1905) was due to other reasons. No reason that Roberts gave for the delay was sufficient to relieve Braffett from making a tender of the deed if he desired to put Roberts in default. Pomeroy, in his work on Contracts and Specific Performance, section 361, in discussing the question of putting a party in default who has failed to make payment at the appointed time, says:

"Where the stipulations are mutual and concurrent—that is, where the deed is to be delivered upon the payment of the price, either on a day named or without any day being specified—an actual tender and demand by one party is absolutely necessary to put the other in default and to cut off his right to treat the agreement as still subsisting. So long as neither party makes such tender—of the deed by the vendor and of the price or securities by the vendee—neither party is in default; the contract remains in force, and either party may make a proper tender or offer and sue, until barred by the statute of limitations."

In Warvelle on Vendors, section 839 (2d Ed.), the author says:

"Where the payment of the purchase money, or any part thereof, and the making or tender of the deed are to concur simultaneously, the one as it were dependent on the other, they are regarded as mutual and concurrent acts, which disable either party from putting an end to the contract without performance or a valid offer to perform on their part. The covenants being mutual and dependent, neither party can insist upon performance by the other without performance or readiness to perform on his part, and, conversely, the same conditions must exist to place either in default. So far as the question of time is concerned, both parties, after the day provided for consummation, may be considered equally in default; and neither can hold himself discharged from the obligation of complete performance until he has tendered performance of his own side and demanded it on the other."

This principle is well illustrated in the case of *Bank of Columbia v. Hagner*, 1 Pet. (U. S.) 455, 7 L. Ed. 219, where the court says:

"In contracts of this description the undertakings of the respective parties are always considered dependent, unless a contrary intention clearly appears. A different construction would in many cases lead to the greatest injustice, and a purchaser might have payment of the consideration money enforced upon him and yet be disabled from procuring the property for which he had paid it. . . . It is evident

the inclination of courts has strongly favored this construction as being obviously the most just. The seller ought not to be compelled to part with his property without receiving the consideration, nor the purchaser to part with his money without an equivalent in return. Hence, in such cases, if either a vendor or a vendee wish to compel the other to fulfill his contract, he must make his part of the agreement precedent, and cannot proceed against the other without an actual performance of the agreement, on his part, or a tender and refusal."

In the case of *Peck et al. v. Brighton Co.,* 69 Ill. 200, it is said:

"We think it a clear proposition that the appellants had no power to forfeit the contract unless they were ready and had the ability to convey according to its terms. How should appellants have shown that they could convey and were ready so to do? The answer is obvious. A deed should have been executed by them and the widow, and tendered to Iglehart and payment demanded." And in the same opinion the court further observes: "Had appellants undertaken to enforce payment of the purchase money by a suit at law, they could not have obtained judgment without first tendering a deed for the premises."

So in this case, if Braffett had brought suit against Roberts to recover on the note representing the unpaid purchase price, he could not have obtained judgment without first tendering a deed of the land. (*Stein v. Waddell,* 37 Wash. 634, 80 Pac. 184; *Telfener v. Russ,* 162 U. S. 170, 16 Sup. Ct. 695, 40 L. Ed. 930; *Robinson v. Harbour,* 42 Miss. 795, 97 Am. Dec. 501, 2 Am. Rep. 671; *Chew v. Egbert,* 14 N. J. Law, 446.)

While the trial court did not expressly find that Roberts had forfeited all rights under the contract, yet the findings made by the court and the judgment rendered thereon have that effect. The contract in this case did not provide for forfeiture in case Roberts failed to pay the notes, or either of them, when due. Courts of equity look with disfavor upon forfeitures, and, as declared in the case of *Frink v. Thomas,* 20 Or. 265, 25 Pac. 717, 12 L. R. A. 239, a case in many respects similar to the one at bar, " 'compensation' and not 'forfeiture' is a favorite maxim with a court of equity." Even where contracts of the class to which the agreement under consideration belongs provide for forfeitures, courts of equity, when appealed to, will almost invariably relieve the

defaulting party from forfeiture sought to be enforced under
the same or similar conditions and circumstances which are
shown to exist in this case and compel specific performance.
In *Edgerton v. Peckham,* 11 Paige (N. Y.) 352, the court
refused to enforce a forfeiture clause in a contract for the
sale of land. In that case the vendee had gone into posses-
sion, paid two-thirds of the purchase price, and made "some
considerable improvements and expenditures on the prem-
ises." The Vice Chancellor, in his discussion of the class of
cases in which forfeitures had been upheld, said:

"None of them are cases of purchases of premises accompanied
with a long enjoyment and the expenditure of moneys on them and pay-
ment of two-thirds of the purchase price." . And in the course of the
opinion he further said: "The proposition which is maintained by
defendant's (vendor's) counsel is a bold and startling one.  .  .  .
It seems to me that this is too monstrous a proposition to be maintained
in the nineteenth century. For while the application of this rule to
the case of a contract which is not executed, by the payment of any
part of the purchase money, is strictly just and proper, it is clear
that to apply it to cases such as I have supposed, or to the very case
at bar, would work the greatest injustice."

Pomeroy, in volume 6 of his Equity Jurisprudence (vol-
ume 2, Equi. Rem. section 816) says:

"Contracts often contain a clause that, if payment is not made
at the day, the defaulting vendee shall forfeit all payments previously
made and lose his right to the land. The courts of equity in England
and most American jurisdictions deal with such forfeiture clause on
the principle that equity abhors a forfeiture and will relieve from it.
It will, if possible, consider the clause as a stipulation for security of
performance, and not as intending a great loss to one party by a slight
failure to perform, and will decree a performance against the vendor
with compensation for delay by interest on the purchase money, thus
relieving against the forfeiture."

And his work on Contracts and Specific Performance, sec-
tion 380, he further illustrates the doctrine as follows:

"Where the clause provides for a forfeiture upon the nonpayment
of the purchase price, at the time or times stipulated, and is, therefore,
intended to secure punctuality in the payment, it has been regarded
almost a matter of course for a court of equity to disregard it, and
to permit a subsequent payment, since interest is treated as a sufficient
compensation for the delay." And while the author says that "the

failure must not be willful, nor the delay unreasonable," and that "the default itself must happen through accident or mistake," he also, in the next succeeding section (381), states the well-recognized rule of equity that: "Acts of part performance by the purchaser—taking possession of the land, part payment of the price, the making of valuable improvements—may, of themselves, constitute a separate and sufficient ground, independently of the provisions of the contract, for relieving him from the effects of a forfeiture incurred by him through failure to complete his performance within the allotted time."

The trial court, as a conclusion of law, found that Roberts was guilty of such "laches and lack of diligence as to bar him of recovery in this action." In 18 Am. & Eng. Ency. Law (2d Ed.), 97, laches is defined to be "such neglect or omission to assert a right as, taken in conjunction with lapse of time more or less great, and other circumstances *causing prejudice to an adverse party,* operates as a bar in a court of equity." (The italics are mine.) In the case of *Chase v. Chase,* 20 R. I. 202, 37 Atl. 804, it is said:

"Laches in legal significance is not mere delay, but delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has in good faith become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes; but when a court sees *negligence on one side and injury therefrom on the other,* it is a ground for denial of relief." (Italics mine.)

Pomeroy, in his work on Equity Jurisprudence, vol. 5, section 21, vol. 2, Equi. Rem.), has incorporated the doctrine as thus announced by the Rhode Island court into his text, and says: "The true doctrine concerning laches has never been more concisely and accurately stated." This court, in the case of *Hamilton v. Dooley,* 15 Utah 280, 49 Pac. 769, speaking through Justice Bartch, said:

"When the assertion of the right is neglected or omitted for a period of time more or less great, and under such circumstances as to cause prejudice to an adverse party, it may operate as a bar in

33·Utah—6

equity. Although a proper ingredient in the law of laches, the instances seem to be rare where courts have declared that mere lapse of time may effect a positive bar, even in case of purely equitable jurisdiction; while, on the other hand, relief has frequently been granted, notwithstanding great delay, when substantial justice could yet be done between the parties. Therefore mere lapse of time, where the parties remain in the same relative position, the delay working no serious wrong to the adverse party and justice being possible, will not operate as a bar in equity." (5 Words & Phrases, 3969-3972.)

There is no fixed or settled standard by which the doctrine of laches can be applied in all cases where it is sought to be invoked. Therefore the question as to what delay or extent of time will constitute laches cannot be determined by the application of purely legal principles, but must be determined by the facts in each particular case. The delay of a few weeks under a given state of facts might constitute laches, where as under another and different state of facts a delay of several years might not amount to laches. In *Wheeling Bridge & Terminal Ry. Co. v. Brewing Co.*, 90 Fed. 189, 32 C. C. A. 571, it was held that seven years did not constitute laches, the delay having caused no change in the conditions nor in the relative positions of the parties.

It is not claimed, nor does the record show, that Braffett has to any degree been injured or prejudiced by the delay in this case. In fact, the record rather tends to show the contrary. The interest tendered him on the unpaid balance of the purchase price far exceed the natural raise in the value of the land. Therefore, to hold that the delay of Roberts in tendering payment in this case is a bar to the equitable relief prayed for in the complaint, would be extending, or rather expanding, the doctrine of laches far beyond any limits recognized by the text-writers or declared by the courts, and would be ignoring and brushing aside the very reasons given for the existence of the doctrine. By granting the relief, Braffett would receive his principal with interest at the rate of twelve per cent. per annum, which is the highest rate of interest that can be legally contracted for and collected under the laws of this state. By refusing specific performance, Roberts will suffer a great and irreparable injury. He will

not only lose the $100 he paid on the purchase price, but also the $500 money and labor expended by him in improving the land and building substantial and lasting improvements thereon. The court found that "the rental value of the premises during the time they were in possession of the plaintiff offset in value the $100 paid by plaintiff to defendant and any permanent improvements plaintiff made upon said premises." The contract in this case does not provide that pending final payment Braffett shall be entitled to an interest in the crops raised on the land nor to any part of the rents and profits, if any, realized therefrom. In fact, the contract negatives any such intent on the part of the parties to it. Therefore this question of rents and profits is a collateral or side issue that can have no legal bearing upon the material questions and issues involved, and ought not to have been injected into the case. Pomeroy, in his work on Contracts and Specific Performance, 427, discussing the rights of the respective parties to rents and profits when there has been a delay of performance, says:

"It will be seen that, in case of delay in completion by default of either party, the compensation is already provided for, without any special direction of the court, by the very terms of the agreement. And this is always equitable and just. If the vendor is in fault and delays to convey the legal title, the vendee does not generally lose anything substantial by the delay; he has the possession all the time, and the rents and profits, and it is right and fair that he should pay interest on the purchase money until the whole is paid up. If the vendee is in default and causes the delay, the vendor still obtains his interest, which equity has determined to be sufficient compensation for a delay in making pecuniary payments."

In volume 1, section 368, of his work on Equity Jurisprudence, the same author says:

"While the legal relations between the two contracting parties are wholly personal—things in action—equity views all their relations from a very different standpoint. . . . So far as the interest or estate in the land of the two parties is concerned, it (the contract) is regarded as executed, and as operating to transfer the estate from the vendor and to vest it in the vendee. . . . The vendee is looked upon and treated as the owner of the land. . . . Although the vendor remains owner of the legal title, he holds it as a trustee for-

the vendee, to whom all the beneficial interest has been passed having a lien on the land . . . as security for any unpaid portion of the purchase money. . . . It follows also as a necessary consequence that the vendee is entitled to any improvement or increment in the value of the land after the conclusion of the contract, and must himself bear any and all accidental injuries, losses or wrongs done to the soil by the operation of nature," etc.

Assuming, however, for the purposes of this case, that the question is a material one, and that the court was called upon to decide it, I still contend that the court erred. The finding is not only unsupported by, but is contrary to, the evidence; and, as I read the record, is contrary to every reasonable deduction that can be drawn from the evidence. When Roberts went into possession of the premises under his contract to purchase, the land was rough, uneven, and in a wild state; and the record shows that to convert only fifteen acres of it into tillable ground so that it would produce agricultural crops, required the expenditure of about $500 in money and labor. It was not shown, nor was there any attempt to show, that the land had any rental value whatever when Roberts went into possession. True, Braffett alleges in his answer that "the rental value of said premises was $75 per year exclusive of taxes." But, as stated, no evidence whatever was introduced to support this allegation. Leaving out of consideration the earning power of the $100 paid by Roberts on the purchase price, I think it is apparent that the interest on the unpaid note alone far exceeded the rental value of the land in the condition it was when the contract was entered into. Assuming, for the purposes of this case, that the rental value of the land was $75 per year, as alleged in the answer, and that Braffett was entitled to have credit for this amount for each of the four years Roberts was in possession as an offset against the $100 paid him on the purchase price and the money and labor expended by Roberts in improving the land, it would still leave a balance in favor of Roberts of about $300. The court, however, in effect, found—and that, too, without any evidence to support the finding—that the rental value of this wild, barren, uneven, and unimproved piece of land for farming purposes during the four years

Roberts was in possession was more than double its market
value. The record shows that the market value of the en-
tire crops raised on the land during the four years Roberts
was in possession was $1,000, or, to be exact, $984.50, or an
average of about $250 per year. In fact, according to the
finding of the court, the yearly rental value of the land was
about $150. That is, the average yearly rental value was
equal to about sixty per cent. of the purchase price or market
value thereof. In other words, the court, in effect, found—
and that, too, without any evidence to support the finding—
that the average yearly profits from fifteen acres of this land,
the market value of which was only about $5.50 per acre,
was about $150, or about $10 per acre. To state the proposi-
tion in another form: The entire piece of land, which rep-
resented a capital or investment to Braffett of $250, yielded
a net profit of about sixty per cent. per annum on the invest-
ment. It is safe to venture the statement that at no time
since the advent of the early pioneers into this arid region
has there been within the confines of this state another piece
of fifteen acres of new and unimproved arid land in the con-
dition in which the record shows this land was when Roberts
took possession, subdued in four years, and during the time
it was being brought into subjection farmed with the mar-
velous results in the shape of net profits as the findings of
the court—not the evidence—show were obtained from the
fifteen acres in question. And these results, as found by the
court, becomes still more remarkable when we consider the
kind of crops raised on the land, and that the average yield
per acre was not at all large or unusual. The evidence intro-
duced by the defendant, which is the only evidence in the
record on this point, shows that the first year on four acres of
the fifteen the crop was an entire failure, on seven acres
there was raised 175 bushels of wheat, and from two acres
there was cut one ton of lucern hay. The foregoing is all
the land produced the first year Roberts was in possession.
The second year there was raised on the land 150 bushels of
corn, 240 bushels of oats, and 1½ tons of hay; the third year
500 bushels of potatoes and 480 bushels of oats; and the

fourth year 250 bushels of potatoes and 15 tons of hay. The market vaule of wheat, potatoes, and shelled corn was one cent per pound. Hay was worth $5 per ton, and oats thirty-five cents per bushel.

To further illustrate the failure of the court to find in accordance with the equities of the case, we have only to consider the equitable interest represented by dollars and cents that each had in the premises. Roberts paid $100 on the purchase price, and thereby reduced Braffett's claim to $150. Roberts, by his own labor and money, increased the market value of the land from $250 to $700. Therefore it will thus be seen that Roberts had $450 producing power in the land, and Braffett had only $150 producing power. The court, however, in effect found that the earning power of Braffett's interest of $150 for the four years not only equalled the $450 of value which Roberts had put into the land, but, in addition thereto, offset the $100 he had paid on the purchase price and all taxes assessed against the premises during the time Roberts had possession. Therefore, as I view the case, a statement of the facts is all that is necessary to show the unsoundness of the finding as well as the want of equity in the judgment rendered thereon. In discussing this phase of the case Mr. Justice Straup, in the prevailing opinion, says: "The value of the grain and products raised by him (Roberts) on the land was $1,085. This of course was not net profits. Where, however, specific performance is invoked on equities arising from possession and improvements, the burden is on plaintiff to show his equity and the loss that will be suffered by him if specific performance is withheld."

It is alleged in the complaint, and the uncontroverted evidence in the case abundantly supports the allegation, that "the plaintiff has at all times since the execution of said contract been in the exclusive possession of said premises, and, relying upon the said contract and his right to the possession and occupation thereof, has made valuable and extensive improvements thereon in good faith and for the purpose of bettering and making more valuable said premises and property. . . . The improvements thus made cost to exceed,

and now are of the reasonable value of, $400." That these improvements were made, and made in good faith, the record, to my mind, is conclusive. If, however, what I have quoted from the opinion of Mr. Justice Straup is intended to hold that the burden was upon the plaintiff to show what the facts were respecting the profits or lack of profits realized from the land during Roberts' possession, I again invite attention to the issues raised by the pleadings. Plaintiff, in his complaint pleaded the contract, the taking possession of the premises under the contract, the partial payment of $100 made on the purchase price, the making of valuable and extensive improvements on the premises, the tender of performance on his part, and the refusal to convey, etc. The defendant admitted the execution of the contract, the payment of $100 by plaintiff on the purchase price, and plaintiff's possession. He denied the making of improvements, and in effect alleged a rescission of the contract by him because plaintiff had defaulted, and that the reasonable rental value of the premises was $75 per year. Now these were the issues, and the only issues, presented by the pleadings. Relying, as he did, upon a rescission of the contract, defendant was bound to show, in order to maintain this defense, that no equity existed in favor of plaintiff by reason of the payment he had made and the improvements he had placed upon the land. To offset whatever equities might have arisen in favor of plaintiff because of part performance on his part, defendant tendered this special defense of rents and profits. The burden was therefore upon him to establish it by competent evidence. This he did not do. Therefore, to require the plaintiff to take the initiative and disprove this affirmative allegation of the answer before the defendant has by competent proof made out a *prima facie* defense on the issue tendered by this pleading, would be to utterly disregard one of the fundamental rules of evidence, namely, "that the burden of proving a proposition or issue lies on the party holding the affirmative." (1 Greenleaf on Evidence, 50.)

The note representing the last installment of the purchase price drew interest at the rate of 1 per cent. per month, and it

was stipulated therein that "in case this note be not paid when due and suit is brought for the collection thereof to pay a reasonable attorney's fee." Now, I think Roberts was authorized in assuming, when he was expending money and labor in improving the land, that should default be made in the payment of the note Braffett would pursue his legal remedy and sue on the note or foreclose his vendor's lien which the law gave him on the property. In pursuing this remedy Braffett would get only that which equity and good conscience demands that he should get, namely, his price, with interest at the stipulated rate, and his costs and disbursements incurred in the suit, including a reasonable attorney's fee. Pomeroy, in his work on Contract and Specific Performance, section 428, says: "If the vendee is in default and causes the delay, the vendor still obtains his interest, which equity has determined to be a sufficient compensation for a delay in making pecuniary payments."

The conclusion of law wherein the trial court found that the plaintiff's lack of diligence amounted to a "practical abandonment of the agreement" is not supported by any fact found or proved in the case. The record shows that Roberts remained in possession, paid all taxes assessed against the land, and continued to improve and cultivate it up to the time he commenced this action. The court undoubtedly arrived at its conclusion from the fact that Roberts failed to tender final payment of the purchase price until long after it became due. When a party goes into possession of land under a contract to purchase and continues in possession, pays all taxes assessed against the premises, and by his own labor and expenditure improves the land until it is nearly trebled in value, as was done in this case, the fact that he may not make the final payment when it becomes due does not, as a legal proposition, create a presumption that he has abandoned or intends to abandon his contract and forfeit all rights acquired thereunder. In Pomeroy on Contracts and Specific Performance, section 375, the author says:

"The rule is applied more readily, a much longer delay is allowed, and the excuse is more leniently examined and favorably received, when, during the period of delay, the purchaser has been in possession, and has been permitted to so remain; for the fact of such possession rebuts any presumption which might otherwise have arisen from the delay that the contract was abandoned, and shows that in the intention of the parties it was still kept as a subsisting and binding agreement."

The evidence in this case, as disclosed by the record, conclusively shows that Roberts neither abandoned nor intended to abandon his contract.

The equities of this case are all in favor of Roberts. It is not a case where the plaintiff has in any degree acquired inequitable advantages by lapse of time. The increase in the value of the land from $250 to $700, as shown by the record, is not due to any natural rise, but is wholly due to the money and labor expended thereon by Roberts since he went into possession of the same. Braffett would not be injured by specific performance in this case, because he would get the balance due on the purchase price, with interest thereon at the rate of twelve per cent. per annum, which, it must be conceded, is a very liberal rate of interest.

There is another principle involved in this case, which, in my judgment, precluded Braffett from rescinding the contract and declaring a forfeiture. Roberts, by paying his first note, and, in pursuance of his contract to purchase, paying the taxes each year and $25 for litigating the water right connected with the land, acquired an equitable interest in the land to the extent of the payments thus made (*Jennison v. Leonard,* 21 Wall. [U. S.] 302, 22 L. Ed. 539)—an interest which Braffett could not terminate without at least repaying, or offering to repay, the money he had received as part payment of the land, and returning to Roberts the unpaid note representing the balance of the purchase price. Braffett neither paid nor offered to pay back the money he had received as part payment of the land, nor did he return the note until after Roberts had deposited the money due thereon, principal and interest, with the clerk of the court in which this action was brought. Therefore, what Braffett

did in the premises by way of declaring a forfeiture and "rescinding negotiations looking to the purchase," etc., of the land, did not operate as a rescission of the contract; and, when Roberts made the deposit referred to, he placed it beyond the power of Braffett to rescind the contract and work a forfeiture of the money he had received as part payment of the land. It is a well-established doctrine that before a party will be permitted to rescind his contract he must account or offer to account to the other party for the money, if any, paid in part performance of the contract. In the case of *Frink v. Thompson,* supra, this same princple of law was involved, and in the course of the opinion the court says:

"There is yet another reason why plaintiff cannot have this contract rescinded. It appears from the complaint that soon after making the contract defendant paid $340 of the purchase price. Before plaintiff can abandon the contract and treat it as at an end, he must refund or offer to refund the money paid in part performance of it, with legal accrued interest. It is a general rule that in order to disaffirm a contract and entitle a party to the right resulting therefrom, the rescinding party must put the other *in statu quo.* . . . It would certainly be unjust to permit plaintiff, after having received a part of the purchase money, to put an end to the contract, upon the failure of defendant to pay the remainder, without offering to account to him for the money already paid. He who seeks the aid of a court of equity must himself do equity. If plaintiff had tendered a deed such as the contract required, he should, in addition, have returned the notes given by defendant, for the purchase money, and the amount paid him by defendant, with legal interest, or at least have offered to return them, before he could be permitted to rescind. This seems to be the universal rule. The party against whom its rescission is sought must be placed *in statu quo.*"

This principle of law is tersely, and, in my judgment, correctly, stated in 7 Ency. Pl. & Pr., 319, 320, as follows:

"Ejectment may be maintained by a vendor to recover possession of real estate from a purchaser who has gone into possession, with the permission of the vendor, under a contract of purchase with the terms of which he fails or refuses to comply, the vendor being then at liberty to treat the contract as rescinded, provided the contract be first legally rescinded by the vendor, by repaying the purchase money already paid, with legal interest thereon, less a fair rental for the premises, and delivering up the notes or bonds given for the balance of the purchase money, or offering to do so. In other words, the vendor must place the vendee *in statu quo.*"

This statement of the rule was quoted and approved by this court in the case of *Brixen v. Jorgensen,* 28 Utah 290, 78 Pac. 674, 107 Am. St. Rep. 720. In *Johnson v. Jackson,* 27 Miss. 498, 61 Am. Dec. 522, it is said:

"The vendors could not abandon the contract and treat it as at an end, without refunding to the vendee the money he had paid in part performance of it. For it is a general rule that, in order to disaffirm a contract and entitle the parties to the rights resulting therefrom, both parties must be placed *in statu quo.* It would certainly be unjust to permit the vendors, after having received part of the purchase money from the vendee at the time of the contract, to put an end to the contract upon the failure to pay the residue of the purchase money, and to make a resale to a third person, without refunding the money paid." (Pomeroy on Con. & Spec. Per., 393; 1 Page on Contracts, sec. 137; 24 Am. & Eng. Ency. Law, 1105, 1110; *Bohall v. Diller,* 41 Cal. 532; *German Sav. Inst. v. Machine Co.,* 70 Fed. 146, 17 C. C. A. 34; Pomeroy on Contracts, 393; *Andrews v. Hensler,* 6 Wall. [U. S.] 254, 18 L. Ed. 737; *Brown v. Witter,* 10 Ohio 143; *Teter v. Hinders,* 19 Ind. 93; *Johnson v. McMullin,* 3 Wyo. 237, 21 Pac. 701, 4 L. R. A. 670; *Kauffman v. Reader,* 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247.)

While there are a large number of cases that hold, where a vendor under a contract of sale makes default and fails to pay the purchase price at the time specified in the contract, the vendor may declare a rescission, it will be seen, however, on an examination of these cases, that they relate to contracts under which the vendor had received no substantial benefits from a partial performance by the vendee. They illustrate the well-recognized principle that when one party only has made default and the parties can be put *in statu quo* the other party may rescind. The doctrine announced in this class of cases is therefore inapplicable to the case at bar. I have not been able to find a case involving the same or similar state of facts such as the record discloses in this case, wherein it was held that the plaintiff was not entitled to any relief whatever.

It is argued by Mr. Justice Frick, in his concurring opinion, that the correspondence carried on between the parties was, in effect, an agreement that unless Roberts made final payment on or before the date therein mentioned (January 25, 1905), the contract would, by mutual consent, be rescind-

ed. That is, the contract, as thus changed, would, by its own terms, terminate and cease to exist. I fail to find anything in the correspondence to justify any such conclusion. Braffett, on January 2, 1905, without tendering a deed, or making any offer to perform the contract on his part, wrote to Roberts from Salt Lake City, where he, Braffett, at the time, resided, as follows: "There is due as a balance upon the ranch at Farnum the sum of $225. Please take notice that unless this money is in my hands by January 15th, on said last-mentioned date I will declare a forfeiture and rescission of the whole agreement with you." Roberts, on January 4, 1905, answered this letter, which answer, so far as material here, is as follows: "I am hard up for money now. I haven't sold any yet from my ranch, but it is time for you to have your money. Can you help me out? I want to mortgage my place. . . . If you will look the matter up for me, I will pay you for your trouble, or refer me to a money loaner if you can. . . . If you cannot do anything, let me know by return mail so I will know what to do so I can get you the money. I may want ten days longer than you gave me, but if you can do anything for me sooner, do so. Let me know as quick as you can." In answer to this letter Braffett wrote to Roberts, in part, as follows: "I cannot help you out on the mortgage suggestion. . . . I can extend the forfeiture period until January 25, 1905, but no longer." There was nothing more said or done by either of the parties in regard to the transaction until March 19, 1905, when Braffett, without having tendered a deed or made any effort to perform on his part, wrote to Roberts as follows: "I regret to be compelled to notify you that in pursuance of previous notices requiring in the alternative the payment of the money at certain specified dates now long past of the rescission of the sale agreement between us, and I have sold the Farnum property to Mr. W. D. Stephens." Giving the foregoing correspondence the most liberal construction of which the language therein contained is susceptible, it falls far short of a mutual agreement to rescind. When stripped of all verbiage and redundant matter, the correspondence, on

the one hand, amounts only to a demand on the part of Braffet for his money, coupled with a notice that unless it was in his "hands" on or before a specified date he would rescind the contract of sale and declare a forfeiture; and, on the other hand, it amounts to a simple request made by Roberts for an extension of time only to pay his note. This so-called "mutual agreement" to rescind in case final payment was not made on a specified date was not pleaded as a defense. It is therefore evident that neither Braffett nor his counsel regarded the correspondence as a mutual agreement, which, by its own terms, rescinded and terminated the contract of sale when Roberts failed to make final payment in accordance with Braffett's demand, and it is also apparent that the trial court did not so view it, for the court found, not that the contract had been mutually rescinded, but that "the plaintiff was guilty of laches and such lack of diligence as to bar him of relief in this action, amounting to a practical abandonment of the contract."

The theory that there was an agreement to rescind is advanced for the first time in the concurring opinion written by Mr. Justice Frick—a theory, which, as I read the record, is entirely at variance with the facts. For this court to hold that there was any such mutual agreement or understanding between the parties, it must read into the correspondence referred to the following propositions: First, that the mutual, concurrent, and dependent covenants of the contract of sale were eliminated and independent covenants substituted therefor; second, that as a condition precedent to receiving a deed for the property Roberts was bound to pay the balance of the purchase price before receiving a deed to the property, and, in case of failure on his part to make the payment unconditionally as stated, the contract, by its own terms, would be rescinded and terminated, and as a result he would thereby be compelled to surrender the property to Braffett without having any of the purchase money which he had paid refunded, and without receiving any remuneration whatever for the outlays he had been to in improving the farm, and without having returned to him the money paid

for taxes and for costs in litigating the water right connected
with the farm, etc.   The whole course of conduct of Roberts
since the correspondence took place shows conclusively that
he did not view the correspondence in that light nor intend
it to have any such effect.   And Braffett's letters, which he
wrote subsequent to January 25, 1905, also conclusively
shows that he did not construe the correspondence referred to
as a mutual agreement to rescind.   In his letter of March
19, 1905, he says: "I regret to be compelled to notify you
that in pursuance of previous notices (not of previous mutual
agreement or understanding) requiring in the alternative the
payment of the money at certain dates now long past or a
rescission of the sale agreement between us," etc.   And again,
May 1, 1905, in a letter to Roberts he says: "Pursuant to
my notice, given you sometime ago rescinding negotiations
(not pursuant to any mutual agreement or understanding)
I beg to return herewith your note for $150 . . . no part
of which has been paid and the payment of which was by my
notice of rescission of said contract waived."

There is another feature connected with these demands
made by Braffett for his money that merits consideration, and
which, as I view the case, conclusively shows that Braffet
himself defaulted, and therefore he could not rescind the
contract.   The letters in which he demanded payment, and
in which, it is claimed, he made time of the essence of the
contract, were written from Salt Lake City, where he, at the
time, resided.   In one of these letters he says: "Please take
notice that unless this money is in my hands by January 15,
. . . I will declare a forfeiture and rescission of the whole
agreement," etc.   Now, the contract of sale was to be perform-
ed at Scofield, Carbon county, and it will be observed that in
neither of his letters did Braffett say that he would be at
Scofield to receive his money and carry out his part of the
agreement, nor did he designate any person to whom Roberts
could pay the money, get his note and receive a deed to the
land.   Therefore I think the only reasonable deduction that
can be drawn from the letters written by Braffett in which
he demanded payment is that the demand was for the pay-

ment of money in Salt Lake City, not at Scofield, where the contract was to be performed. This conclusion is further borne out by the fact that it was not shown at the trial, nor was there any claim made, that Braffett was at Scofield on the day when final payment was to be made, January 25, 1905, to receive his money and to perform his part of the contract, or that he either left or deposited a deed at Scofield to be delivered to. Roberts on payment by him of the balance of the purchase price. Now it must be conceded that Braffett could not arbitrarily change the place of performance of the contract and put Roberts in default because he failed to comply with a demand made for money at a place different from that fixed by the contract.

In the discussion of this case and in the application of legal principles to the questions involved, it must be borne in mind that it is not a case where the vendee has refused to proceed further under the contract and has signified his intention to no longer be bound by its terms, thereby relieving the vendor of his obligations to perform or offering to perform his part of the contract, but it is a case in which the whole course of conduct of the vendee in relation to the transaction since he entered into possession of the premises shows that it has been his intention all along to ultimately pay for the land and acquire a title thereto. In the opinion written by Mr. Justice Straup, it is said that: "The evidence further shows that until plaintiff deposited the money with the clerk of Carbon county, no demand or request had been made by him for a deed, nor did the defendant ever make an actual tender." The fact is that the defendant at no time made any kind of a tender whatever, either actual or otherwise. In going through the record in this case we look in vain for any evidence which tends to show that Braffett at any time or place had a deed made out ready for delivery to Roberts upon payment by the latter of the unpaid purchase price of the land. In fact, so far as the record shows, Braffett, in all of his correspondence and personal interviews with Roberts respecting the matter in controversy, never mentioned a deed but once, and that was in his letter of

July. 6, 1903; and the reference therein made is as follows: "I wish you would drop me a line and inform me as to whether you desire to pay the note and secure the deed." This was not a tender, nor in any sense an offer to perform. As hereinbefore stated, the contract was to be performed at Scofield. It was not shown, nor is it claimed, that Braffett was at Scofield to receive the money, surrender the note and deliver to Roberts a deed to the land; nor did he designate any person at that place to whom Roberts could pay the money and from whom he might take up his note and receive a deed to the land. Therefore Roberts could not have paid the money at Scofield on the day mentioned, because, as stated, there was no one there authorized to receive it. And he was under no legal obligations to pay the money at any place other than that fixed by the contract. True, Roberts had agreed to pay the money at Scofield on the date mentioned, and Braffett, likewise, had agreed to surrender the note and deliver a deed to Roberts upon payment of the money. But both defaulted, and neither of them was there, either in person or by representative, to carry out the contract. Therefore neither Roberts nor Braffett was in a position to rescind and terminate the contract, for the reason that neither of them had tendered performance. In other words, by failure to perform, or offering to perform, each of the parties waived performance of the contract on that date. (*Van Campen v. Knight,* 63 Barb. [N. Y.] 205.) It, therefore, necessarily follows that at the time Roberts made the deposit hereinbefore mentioned with the clerk of Carbon county the contract was still a valid, alive, and subsisting one, and not dead as suggested by Mr. Justice Frick, in his concurring opinion. (Pomeroy, Con. and Spec. Perf., 404, 405; *Leaird v. Smith,* 44 N. Y. 618; *Raymond v. San Gabriel L. & W. Co.,* 53 Fed. 883, 4 C. C. A. 89.).

For the reasons herein stated, I am of the opinion that the cause should be reversed, with directions to the trial court to enter judgment for the plaintiff as prayed for in his complaint.