STATE, by and through PUBLIC WELFARE
COMMISSION et al. v. BONNETT et ux.

No. 7060.   Decided January 21, 1949.   (201 P. 2d 939.)

Rehearing Denied April 4, 1949.

548

See 3 C. J. S., Alteration of Instruments, sec. 63; 49 Am. Jur. 55; Reformation of contract and specific performance thereof in same action, note, 66 A. L. R. 781.

*George S. Ballif,* Dist. Atty., of Provo, and *Martin M. Larson,* of Salt Lake City, for appellants.

*Grover A. Giles, Zar E. Hayes,* and *C. N. Ottosen,* all of Salt Lake City, for respondents.

LATIMER, Justice.

Appeal from a judgment of the District Court of Utah County ordering defendants to surrender possession of and execute a deed conveying a certain tract of farm land located adjacent to the Utah State Hospital at Provo, Utah, to the plaintiffs. The appeal is also from a money judgment entered in favor of the plaintiffs.

The facts of the case are as follows: In 1941 the State Legislature authorized the Department of Public Welfare to purchase various tracts of land, including the tract which is the subject of this action; but no funds were appropriated for use in making such purchases. Thereafter, on June 1, 1941, defendants gave the Utah State Hospital an option to purchase the lands herein involved. The Board of Trustees of the hospital took possession of the land and cut and removed some of the hay, but subsequently surrendered possession of the land back to the defendants, advising them that the State had provided no money with which to pay for the land.

On March 5, 1945, after negotiations extending over a period of two to three weeks, the defendants executed and delivered to certain officers of the Utah State Hospital, the following written option, the instrument being a printed form with blank spaces as indicated below by italics, which blank spaces were filled in by typewriting to complete the option agreement:

"Know All Men by These Presents, that *George Bonnett* and *Hattie Bonnet* of *Provo City, Utah* County, State of *Utah,* part *y* of the first part, in consideration of the sum of *One and No/100* Dollars to ............................ in hand paid by *Utah State Hospital* and *George and Hattie Bonnett* part *y* of the second part, hereby give s and grant unto the said part *y* of the second part and *their* assigns, the option and right to purchase at any time before *March 11, 1945 at 8:00* o'clock *A.M.,* the premises hereinafter described for the purchase price of *Fifteen Thousand Six Hundred 15,600* Dollars to be paid said

part *y* of the first part at *Provo, Utah,* upon the exercise of said option. The part *y* of the first part, before said payment is required to be made, and before this option shall terminate or the term expire, shall deliver to the second part *y* a certified abstract of title showing title in *them* selves in fee, together with a good and sufficient deed conveying the title in fee, to said described property, to the said part *y* of the second part, or *their* assigns. Time is of the essence of this contract.

"Description of Property

"35.19 acres more or less located in the Southeast and Northeast Quarters of Section 6, Township 7, South, Range 3 East of the Salt Lake Base and Meridian. Purchase price is for land and water right only and 30 shares of Upper East Union Water stock. Party of the first part agrees to remove buildings from the land on or before six months from date of sale."

Thereafter the Bonnetts received a written communication from the superintendent of the hospital and the chairman of the Public Welfare Commission dated March 7, 1945, advising them that it was the intention of the Utah State Hospital to purchase the land as soon as an abstract and warranty deed could be made transferring the land to the hospital. The letter is set out verbatim later in this opinion. On the same date of the letter, the Utah State Finance Commission transferred to the credit of the Public Welfare Commission funds in the amount of $15,600, to purchase the land. Shortly after receipt of the letter Mr. Bonnett delivered some of the prior deeds to the property to an agent of the hospital and discussed the preparation of the abstracts. Later the Bonnetts became dissatisfied with their bargain and on March 31, 1945, through their attorney, notified the superintendent of the hospital in writing that they did not desire to sell their property. This resulted in suit being filed by the plaintiffs on June 4, 1945.

Two or three days after the option was given, the employee of the hospital who had drawn the option realized that he had failed to fill in the blank space following the phrase "in consideration of the sum of One and no/100 Dollars to," and so filled in the word "them" in that space. He also discovered that he had er-

roneously added the names "George and Hattie Bonnett" in the blank space following the phrase "in hand paid by Utah State Hospital and" so he erased those names, making the original copy of the instrument to read as follows:

"Know All Men by These Presents that George Bonnett and Hattie Bonnett of Provo City, Utah County, State of Utah, party of the first part, in consideration of the sum of One and No/100 Dollars to them in hand paid by Utah State Hospital, party of the second part * * *"

The above changes were made out of the presence of and without the knowledge or consent of the optionors. As one assignment of error, appellants assert that the evidence did not support the trial court's finding that the changes were satisfactorily explained. We can see no merit to this contention. The evidence was undisputed that the consideration named in the agreement was in fact paid to the Bonnetts the day after the agreement was made, and so the word "them" is the only word which could rightfully be inserted in the blank complained of unless the proper names to whom the preposition refers were used; i. e., George and Hattie Bonnett. As to the erasure of the names George and Hattie Bonnett, we cannot see how that had any effect whatsoever on the instrument. These people were first named in the instrument as the party of the first part and recipients of the consideration paid by the hospital. They could not also be the party of the second part and the ones who paid the consideration. The erroneous inclusion of their names the second time as being an optionee was shown by the evidence to have been an innocent mistake. Neither the presence nor the absence of their names in that particular place in the instrument affected in any way the rights of the parties to the option. These alterations were therefore immaterial, as the trial court rightly held.

Appellants contend that the complaint fails to show the purported option was entered into with the approval of the Governor and the Department of Finance citing Sec. 85-7-4, U. C. A. 1943. The first portion of

that statute will show that such approval was not necessary to obtaining the option, and so we quote:

"With the approval of the governor and the department of finance, the public welfare commission may contract and be contracted with, and may sue and be sued, in all matters pertaining to the hospital. It may take and hold by gift, devise or bequest real and personal property required for the use of the hospital, and with the approval of the governor it may convert property so received, and not suitable for its use, into money or property which is suitable for such use."

The securing of the option was in no sense the making of a contract binding upon the Utah State Hospital or the Public Welfare Commission. No one other than the Bonnetts incurred any contractual liability as a result of the option until such time as it was exercised. By that time the approval of the Governor and the Department of Finance had been obtained, and so the requirements of Section 85-7-4 were satisfied.

One of appellant's chief contentions on this appeal is that the plaintiffs failed both on the pleadings and on the evidence to show that the State of Utah was a party to the contract and hence that the State had no right to maintain this action. This contention is based largely upon the fact that the name of neither the State nor the Public Welfare Commission appears in the option agreement. That contention, however, overlooks the fact that the theory of the State's case as shown in the pleadings and the evidence was that the Superintendent of the Utah State Hospital was, in all his dealings with the defendants concerning the option, acting as agent of the Public Welfare Commission and the State of Utah. This is reflected in the pleadings at Paragraph 4 of the complaint:

"That subsequent to the passage of said act by the Legislature as above set forth, Dr. Owen P. Heninger, Superintendent of the Utah State Hospital, acting for and on behalf of, and under the express direction of, the Public Welfare Commission," etc.

The record is replete with evidence of the fact that George and Hattie Bonnett were fully aware that it was the State

of Utah which was attempting to purchase their land in this transaction. They had resided on land contiguous to that of the State Insane Asylum, properly known as the Utah State Hospital, for thirty-five years, and they certainly knew that if they sold their land to the hospital they would be selling it to the State of Utah or to one of its administrative agencies for the use and benefit of the hospital. Defendant George Bonnett in his testimony consistently referred to the transaction as a sale "to the State" and the hospital land as "State property." When he discussed the matter with hospital officers in 1945 he requested information about the possibility of the State paying $15,000. He was told it was doubtful but that the State Finance Department would be consulted. We think the plaintiffs properly made out a case of agency in this transaction between the Superintendent of the Utah State Hospital and the State of Utah and its Public Welfare Commission. The principal being known to the vendors, we have the case of an agent securing an option for the sale of land, the agent being named as optionee and the vendor being fully aware that the ultimate contract was to be entered into for the principal. The rule respecting such a situation is we think correctly set forth in the American Law Institute's Restatement of the Law, Agency, Sec. 292:

"The other party to a contract made by an agent acting within his power to bind a disclosed or partially disclosed principal is liable to the principal as if he had contracted directly with the principal, unless the principal is excluded as a party by the form or terms of the contract."

As to whether or not the State of Utah was a party to the contract, we refer to Section 147 of the above, which reads in part as follows:

"(a) In transactions entered into by an agent on behalf of a disclosed or partially disclosed principal, it is ordinarily inferred that the principal is intended to be a party thereto; and unless the circumstances or the form of the contract indicate that the third person intends to deal only with the agent, the principal is a party. * * *"

We think the complaint fairly stated and the evidence supported the allegation that the option agreement was entered into by the Utah State Hospital acting through its superintendent Dr. Owen F. Heninger, who was authorized to and was acting for the State of Utah and the Public Welfare Commission, and that the Bonnetts were fully and fairly apprised of this relationship.

Appellants complain that the State of Utah should not be allowed specific performance of this contract because of lack of mutuality in that the defendants would not have been able to enforce the agreement against the State or the Public Welfare Commision. However, such is not the case. As said in Restatement of the Law, Agency, Section 149,

"A disclosed or partially disclosed principal is subject to liability upon an authorized contract in writing if not negotiable or sealed, although it purports to be the contract of the agent, unless the principal is excluded as a party by the terms of the instrument or by the agreement of the parties."

Nowhere in the agreement at hand was the State of Utah or the Public Welfare Commission excluded as a party, and so when the option was exercised by the Welfare Commission, had the defendants performed their part of the resulting contract, we see no reason why they could not have required the Welfare Commission to perform.

Appellants next contend that the Utah State Hospital is not a legal entity and so could not have acted as agent for the State in this transaction, nor could it have been the optionee on its own behalf and later have assigned its interest to the State. The plaintiff is not contending that the hospital executed the agreement on its own behalf, but as agent of the State of Utah. The law of agency does not require the same capacity or legal qualification on the part of an agent as is required to make a contract on one's own behalf. In fact the legal incapacity of the agent in no way affects the resulting relationship

of his principal to third persons. The fact here that the hospital, though not expressly prohibited by statute, might not be able to make a contract on its own behalf, does not mean that it lacked the power to act as agent for the State or the Welfare Commission or both. No one could reasonably contend that when the State Legislature passed and the Governor signed the bill authorizing the purchase of this tract of land in 1941, and later in 1945 appropriated the money to pay for it, that the State of Utah had not authorized some agent or agency to negotiate for and on its behalf. The capacity of the agent in obtaining the option is not of controlling importance. The capacity of the agent would be important if the problem concerned his right to exercise the option, but in this instance, the acceptance was by the appropriate department.

Appellants urge that the evidence does not support the trial court's finding that the option was exercised, for the following reasons: (1) The option was not exercised or accepted by the party named as optionee; (2) the words "it is our intention to purchase this land as soon as abstract and warranty deed can be made transferring the land to the Utah State Hospital" are not an unequivocal acceptance or exercise of the option; and (3) there was no payment, tender, or promise of payment contained in the letter of acceptance.

The letter of acceptance is set forth verbatim as follows:

|  |  | Commission |
| --- | --- | --- |
| The State of Utah | | Sophus Bertelson |
| Department of Public Welfare | | Chairman |
| #220 State Capitol | | J. Parley White |
| Salt Lake City, Utah | | David R. Trevithick |
| March 7, 1945 | " (State Seal) | (on leave) |
| George and Hattie Bonnett | | |
| Provo, Utah. | | |

Dear Mr. and Mrs. Bonnett:

"In regard to the agreement entered into with the Utah State Hospital dated at Provo, Utah, March 5, 1945, wherein an option to purchase 35.19 acres of land was obtained, please be informed that it is

our intention to purchase this land as soon as abstract and warranty deed can be made transferring the land to the Utah State Hospital.

Yours very truly,

/s/ Owen P. Heninger, M. D.
Superintendent
Utah State Hospital

Approved:
/s/ Sophus Bertelson

Chairman Public Welfare Commission
/s/ Gordon Taylor Hyde

Chairman State Finance Commission"

Treating first the contention that the option was not exercised or accepted by the party named as optionee: The letter was written on a letterhead of the State of Utah, Department of Public Welfare, and signed by the Superintendent of the State Hospital (the agent with whom the vendors had dealt throughout the entire transaction), the Chairman of the Public Welfare Commission and the Chairman of the State Finance Commission. The State of Utah had been negotiating with the optionors off and on from 1941 to 1945, and the State's agents with whom the Bonnetts dealt never claimed to be representing themselves or anyone other than the State of Utah. We hardly see how, upon receipt of this letter, there could have been any doubt in the minds of the optionors that the party or parties to whom they had given the option were attempting to exercise it. Furthermore, it was not necessary that the option be exercised in this case by the one named as optionee, he being agent for a known principal. In such case the principal himself may exercise the option so long as he is not expressly excluded as a party, by the terms of the option. See Section 802 of James on Option Contracts.

In support of the second reason that the option was not exercised, appellants urge that the wording in the letter,

"it is our intention to purchase the land as soon as abstract and warranty deed can be made transferring the land to the Utah State Hospital," is not an unequivocal acceptance of the option. It is appellants' position that these words amount merely to an expression of what the optionee intends to do in the future. Assuming such construction could be given the phrase, the following question is posed: What was it that the optionee intended to do in the future? It was not that it intended to exercise the option, but that it intended to purchase the land as soon as the abstract and warranty deed could be prepared. At least one of the accepted definitions of the word "purchase" is "to obtain something by paying therefor money or its equivalent." The plain import of the letter is that the State of Utah intended to obtain the land by paying the purchase price as soon as the ordinary and necessary business transactions could be completed. However, we need not go to the extent of dissecting the letter word by word or phrase by phrase. In this particular case neither party was mislead by the phraseology of the letter. There was a meeting of the minds on both the option and the contract, and in fact, both parties treated the contract as completely executed. The State through the Finance Commission made the money available to the Welfare Department, and the Bonnetts delivered the deeds to the hospital office after receipt of the letter of March 7th, and discussed the preparation of abstracts with one of the parties who had been negotiating for the State.

The third reason assigned by the defendants, that the terms of the option were not complied with because the State failed to tender the money during the period of the option, presents a more serious problem. In the case of *Gibbs* v. *Morgan*, 101 Utah 66, 118 P. 2d 128, this court construed an option contract similar in context to the one involved in this action, and held that the optionee had not exercised his option within the time allowed. The majority opinion of the court fails to state what action,

if any, the optionee took during the option period with regard to exercising the option, so it is impossible to determine what if any notice of election was given. That no such action was taken by the optionee seems implicit in the reasoning of the concurring justice.

In the option before us we are confronted with apparently inconsistent provisions. For purposes of clarity, we assemble them in respective groups. The first group consists of the following: The optionee has the right to purchase the land at any time before March 11, 1945, at 8:00 A. M. The purchase price to be paid to the optionors upon the exercise of the option. Time is of the essence of the contract.

In the second group we place the following: Before payment is required to be made, and before this option shall terminate or the term expire, the optionor shall deliver to the optionee an abstract of title showing a good and marketable title.

It becomes our duty to reconcile, if possible, these provisions. Perhaps by elimination we can determine from the words of the option agreement the intent of the parties. The two provisions, one in reference to the time in which the purchase must be made, and the one in regards to time being of the essence, are apparently for the purpose of strictly limiting the time in which the option must be converted into a binding contract by exercising the option. Thusly construed, each provision is given full force and effect. Neither the provision for the payment of the purchase price at the time the option is exercised, nor the provision requiring delivery of abstract and deed before payment of the purchase price, can be construed literally without reading one or the other out of the option. They can, however, be reconciled in the following manner: That in exercising the option the agreement contemplates two successive steps, i. e.: (1) The election to and notification of the exercise of the option; and (2) the payment of the

purchase price. That intervening between these two steps, if the option so provides, the optionor must furnish an abstract of title for inspection by the vendee. If the first step was taken by the optionee, the second step to complete the exercise of the option, i. e., the payment of the money, was not required until the abstract had been furnished by the optionor and a reasonable time permitted the optionee to determine the marketability of the title.

In aid of this construction we are permitted to consider how the parties interpreted the contract. The option was to run for a period not to exceed five and one-half days, and the parties contemplated the necessity of obtaining during that time, some authorized department of the State to exercise the option. The optionors had not purchased the full tract of land at one time, and according to Mr. Bonnett there were some seven abstracts involved. A fair inference from other parts of his testimony is that there were certain deeds to him that were or had not been entered on the abstracts and that the abstracts must be brought up to date. To expect that the necessary steps to completely close this transaction could be taken within the time stated hardly impresses us with being reasonable. When Mr. Bonnett received the letter of notification, he must have believed the contract was agreed upon and that he would not receive his money until he had furnished the abstracts of title because he delivered certain deeds to Mr. Jensen at the hospital for the purpose of permitting the abstracts to be completed. The subsequent acts and conduct of both parties indicate that they construed the contract alike and within the purview of a construction permitted as possible by the language of the option.

We believe that the State in this case complied with the terms of the option so as to make the contract binding on the defendants. We do, however, point out that we are not faced with an action wherein the party seeking to enforce the contract has in any way been dilatory in performing any of the conditions imposed. Not only was the option

exercised within the time allowed, but the money had been transferred to the appropriate department and was available to the defendants at any time the title could have been inspected and approved.

Defendants in a number of assignments of error insist that certain findings of fact made by the trial court are not supported by and are contrary to the evidence. They further assign as error the holdings of the trial court finding against them on their equitable defenses. These assignments deal with undue influence, duress, inequitable treatment, unequal bargaining power, and disparity between the purchase price of the land and its reasonable value. With the exception of the last-mentioned, these assignments will be treated collectively.

The trial court prior to rendering judgment rendered and filed a memorandum opinion which has been made a part of the bill of exceptions. He minutely and carefully set out the facts in the record which had some materiality on each of the defenses, and concluded that the evidence did not sustain the allegations of the answer. Without detailing all of the evidence we are of the opinion that the trial judge correctly found on these issues and we accordingly overrule these assignments of error.

While appellants claim the consideration for the sale of the land is grossly inadequate, the trial court found otherwise. There is evidence in the record that for building lot purposes the land was reasonably worth $35,000. The same witness who so testified, however, further testified that for farming purposes the land would only be reasonably worth the sum of $350 per acre. This would make the total tract worth approximately $11,000. There was also evidence that property comparable to the Bonnett property was sold in 1943 for $200 per acre and there was other evidence that property in the near vicinity had been sold for building lots at prices far in excess of that which the State had agreed to pay the Bonnetts. In this connection it is worthy

of note that Mr. Bonnett in discussing the sale was interested in procuring another farm. He had considered trading his land for other farming land. The State was purchasing the land primarily for farming purposes. When the parties were discussing terms of the sale in 1945, Mr. Bonnett suggested a price of $15,000. He was at first told by one of the parties acting for the State that it was doubtful the State would pay that much. Later, Bonnett was informed that the State would meet his price and yet he requested time to further consider it. When the deal was later consummated, Bonnett had improved his original suggestion by obtaining $15,600 plus 7½ shares of water stock and permission to remove the buildings from the farm.

We are not prepared to say the trial court erred in his conclusions on this issue. There is evidence which indicates the Bonnetts received a fair consideration for the land. In addition, the record indicates that Mr. Bonnett was conversant with the development that had been go- 12, 13 ing on in Provo City. He had been interested in disposing of his land and had plenty of opportunity, if he so desired, to determine the fair value of property. Both parties dealt at arms length, and nowhere in the record does it appear that any State agent misrepresented any material fact or in any way tried to force a sale or coerce the Bonnetts into selling their land. The record does indicate that sometime later the Bonnetts decided they had made a bad deal but, if so, through no fault of the State. The mere fact that defendants may have made a bad bargain is not sufficient to require this court to overrule the trial judge where no fraud, deceit, misrepresentation or undue influence is established.

After determining that plaintiff was entitled to specific performance of the contract and that plaintiff was further entitled to a money judgment for the reasonable rental value of the land during the time defendants had wrongfully occupied it, the court found and rendered judgment that defendants were entitled to interest

on the $15,600 at the legal rate from March 7, 1945. From that portion of the judgment awarding defendants interest, the State has cross appealed.

We are satisfied the court reached the wrong conclusion on this phase of the case. It follows from the reasoning set out above that the defendant breached the contract and subsequently notified the State that they would not perform. Ordinarily, this defeats their right to recover interest on the purchase money. In deciding this issue the trial judge concluded the State had not done all that was necessary to notify the defendants the money was available for their use. The failure of the State to tender the money into court on the day the complaint was filed is the principal act relied on by the trial judge to sustain his ruling. At that stage of the controversy it is exceedingly doubtful that the State needed to pay the money into court. The State had already been notified that the Bonnetts would not convey the property, so a tender would have been, at that time, a futile gesture. In refusing to perform, the Bonnetts raised no question about the ability or inability of the vendee to pay, and the record established that the money had been made available to the Public Welfare Commission. Section 326 of Pomeroy's Specific Performance of Contracts, 3rd Edition, states the rule to be:

"Although the plaintiff must in general show an actual performance on his own part, or else a tender or offer of performance, yet such tender or offer is sometimes unnecessary, and a readiness and willingness to perform is sufficient. The necessity of a tender is obviated, and the readiness and willingness supply its place, whenever the case shows either in the allegations or the evidence, that if a tender had been made it would have been refused by the defendant; * * * under such circumstances, equity does not require the empty show of a tender."

When the State deposited the money with the Clerk of the Court it no longer had the use of it. To penalize the State by requiring it to pay interest on money that it had made available to the defendants seems to be adding a burden

on the State for displaying good faith. Payment of interest should not be required if a debtor is prevented from making payment by the acts of a creditor. In this case, immediate payment by the State was prevented by the acts of the defendants and the money was always available to them had they desired to carry out the terms of their option.

We might be inclined to agree with the results reached by the trial court had the defendants at any time or in any way been prejudiced by the acts of the State, or had the State actually had the use of the money while the case was being litigated. The most that can be charged against the State is that in the complaint it is alleged the money was deposited with the clerk of the court and the clerk's records show it was not deposited until 14 days later. This lapse of time could not have been prejudicial to the defendants, who, previous to the filing of the complaint had refused to perform and who have consistently refused to be bound by their contract.

The equitable theory in these cases is to try to place the parties in substantially the same situation they would have occupied had the defendants not defaulted. If we follow this reason in this case we would say that had the defendants performed, the State would have had the use of the land and the defendants the use of the money. Here, in effect, the defendants have the use of the money. When the fund was appropriated for the specific purpose of paying for the land and was deposited with the Clerk of the Court, the State could not have had the use of it. The money could have been obtained and used by the defendants had they so elected, but it could not be used by the State. The defendants are the parties who elected to have the money remain idle. Rather than penalize the State for making the money available to the defendants we believe the loss of the use of the money should be borne by the wrongdoer.

The judgment is modified in accordance with this opinion and as modified is affirmed. The cause is remanded

with directions to enter judgment in accordance with this opinion. Costs to respondents.

WOLFE, J., concurs.

McDONOUGH, Justice (concurring).

I concur. I do so because I regard the letter of acceptance of the Department of Public Welfare set out in the opinion of Mr. Justice LATIMER as a verbal exercise of the option. True, if its words be construed literally, it but expresses an intent to exercise the option in the future. However, in the light of the surrounding facts and circumstances, I am convinced that it was intended by the writer and so understood by the recipients as though it stated

"The option of March 5, 1945, is hereby exercised and as soon as an abstract can be obtained and the warranty deed made we will pay the purchase price therefor."

Taking the surrounding facts and circumstances into consideration, I believe that this would be a sufficient exercise of the option, if a verbal acceptance without tender would be sufficient, to support a decree of specific performance, were the defendants seeking such decree.

So construing the letter of acceptance, I concur with the construction of the option set out in the opinion of Mr. Justice LATIMER. The court's opinion in the case of *Gibbs* v. *Morgan,* 101 Utah 66, 118 P. 2d 128, does not state whether or not during the option term there was an unequivocal, verbal exercise thereof. If the record in such case discloses in fact that there was, then in my opinion the case was wrongly decided and should be overruled.

PRATT, Chief Justice (dissenting).

I dissent. The option is to be accepted by payment of the $15,600. Simultaneously therewith the vendors are to deliver the abstract of title and the deed. In other words,

concurrent acts by both parties are contemplated: the vendee to pay the purchase price; the vendors to deliver the deed and abstract. Neither party can put the other in default without tendering performance of his side of the obligations. A mere statement that the vendee will, in the future, make payment is not a compliance with the requirements of the contract. Attention must be given to the provision that reads:

"* * * $15,600.00 *to be paid* said parties of the first part at Provo, Utah *upon the exercise of said option.*" (Italics added.)

Nothing less than payment, or tender of payment is sufficient.

This payment or tender of payment was to be made not later than 8:00 A. M., March 11, 1945. By its express terms time was of the essence of the contract. See *Gibbs* v. *Morgan,* 101 Utah 66, 118 P. 2d 128. This then is the application of the time limit responsibility element: The vendee could, at 8:00 A. M., March 11, 1945, but not later, present the $15,600 to vendors. If the vendors were not then and there ready to deliver the abstract and deed, the vendee could (1) withdraw the $15,600 and refuse to perform, in which case the vendors could not enforce specific performance as they had not presented the abstract and deed; or the vendee could (2) insist upon specific performance as the vendee had performed its condition precedent to the insistence upon such performance. The proceeding as submitted to us for determination, lacks this condition precedent to such specific performance.

I invite attention to the following authorities: *Kessler* v. *Pruitt,* 14 Idaho 175, 93 P. 965; Note 30, 52 A. L. R. 1470, Sec. 3; *Roberts* v. *Braffett,* 33 Utah 51, 92 P. 789; Pomeroy's Specific Performance, 3rd Ed. (1926) Secs. 361, 362.

The arrival of 8:00 A. M. March 11, 1945, with the vendee failing to act ended the matter. As this was an option agreement and not a contract of sale of real estate, the

vendors could not, by tendering the abstract and deed, impose a duty upon the vendee to act. If, however, the vendee had tendered the purchase price, the vendors could rely upon that tender as a foundation for specific performance provided they tendered the abstract and deed before the vendee withdrew the purchase price.

WADE, Justice (dissenting).

I dissent. I agree with Mr. Chief Justice PRATT that respondents had failed to exercise the option. One of the terms of the option involved in this case was that respondent had

"the option and right to purchase at any time before March 11, 1945, at 8:00 o'clock a. m. the premises hereinafter described for the purchase price of Fifteen Thousand Six Hundred 15,600 Dollars to be paid to said party of the first part (appellants) at Provo, Utah, upon the exercise of said option."

This clearly contemplates the payment of the purchase price upon the exercise of the option. As stated by James, Law of Option Contracts, Sec. 839, at page 360:

"The option itself is the test of the sufficiency of the election, but it is sometimes difficult to determine from the language used just what acts constitute the election. It is competent, for instance, to provide that in addition to communication of the bare fact that the optionee elects to purchase, that the whole or a part of the price for the property shall then be paid, or that some other act shall be done as a part of the act of election or as a condition precedent to exercise of the option privilege. Clearly in such cases a mere notice of election is fatally short of the option requirements.  *  *  *"

The fact that the option also contained a provision that

"The party of the first part, before said payments is required to be made, and before this option shall terminate or the term expire, shall deliver to the second party (respondent) a certified abstract of title showing title in themselves in fee, together with a good and sufficient deed conveying the title in fee,  *  *  *,"

does not change the obligation to make the payment within the time agreed upon in order to exercise the option. See

*Gibbs* v. *Morgan,* 101 Utah 66, 118 P. 2d 128, wherein this court, in construing an option agreement very similar to the one in the instant case, held that the option must be exercised within the period provided therein, even though no abstract of title or deed had been delivered by the optionee within that time. Had respondents placed the sum of money which they agreed to pay in a place where it would not have been in their power to withdraw it in the event appellants complied with their part of the conditions of the option, and so advised them, it would have been a sufficient compliance, in my opinion.